OUR COUNTRY HOME ENTERPRISES, INC., ET AL.,[1] PETITIONERS *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 25764–10, 25765–10, 11520–11, 11521–11, 12744–11, 12745–11, 12746–11.

Filed July 13, 2015.

SP is a purported welfare benefit plan consisting of the respective separate plans that each participating employer customizes to apply to its employees alone. SP pays death, medical, and disability benefits with respect to a participating employee to the extent that his or her participating employer selects. Each employer selects the general provisions, the participation requirements, and the vesting schedule applicable to its plan. Each employee designates to whom SP will pay the benefits with respect to him or her. The death benefit that SP agrees to pay as to a participating employee is the face amount of an insurance policy that SP purchases on the employee's life. The employer effectively pays the premiums on the insurance policy through its payments to SP, and the insurance policy usually has a cash value component that increases annually. SP's payment of any nondeath benefit as to an employee is generally limited to the cash value

[1] Cases of the following petitioners are consolidated herewith: Thomas P. Blake and Cynthia S. Blake, docket No. 25765–10; Netversity, Inc., docket No. 11520–11; Juan Carlo Mejia and Yvette Mejia, docket No. 11521–11; Richard J. Abramo and Catherine S. Abramo, docket No. 12744–11; Robert V. Brown and Andrea Yogel-Brown, docket No. 12745–11; and John A. Tomassetti and Cathy C. Tomassetti, docket No. 12746–11.

of the insurance policy related to that employee. An employer may terminate its participation in SP and cause each of its employees to be fully vested in his or her policy (including its cash value). A participating employee, upon retiring, may take his or her insurance policy in satisfaction of any postretirement death benefit payable as to the employee. O and N are C corporations, each wholly owned by a single individual; E is an S corporation owned equally by three other individuals; and each of those five individuals was employed by the corporation he owned. O and E each participated in SP and caused SP to purchase insurance on the lives of their shareholder/employees. N participated in SP but did not cause SP to purchase insurance on an employee's life. *Held*: The life insurance policies that were issued on the lives of the four shareholder/employees incident to their corporations' participation in SP were part of a split-dollar life insurance arrangement. *Held*, *further*, the economic benefit provisions of sec. 1.61–22(d) through (g), Income Tax Regs., are not invalid, and the four shareholder/employees with insurance on their lives realized income (compensation for O's shareholder and guaranteed payments for E's shareholders) as to the split-dollar life insurance arrangements in amounts as ascertained from those provisions. The economic benefit provisions are inapplicable to N and its owner because no life insurance was issued in those cases. On the basis of *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002), and its progeny, N's owner realized dividend income to the extent of the payments that N made to SP. *Held*, *further*, none of the corporate employers may deduct its payments to SP. *Held*, *further*, Ps are liable for the accuracy-related penalties that R determined under I.R.C. sec. 6662(a). *Held*, *further*, Ps are liable for the accuracy-related penalties that R determined under I.R.C. sec. 6662A, to the extent stated.

*Steven S. Brown*, *Denis John Conlon*, *Allen James White*, and *William G. Sullivan*, for petitioners.

*Angela B. Reynolds*, *David S. Weiner*, and *K. Elizabeth Kelly*, for respondent.

LARO, *Judge*: These seven cases are before the Court consolidated for purposes of trial, briefing, and opinion.

Petitioners petitioned the Court to redetermine the following Federal income tax deficiencies and accuracy-related penalties that respondent determined:[2]

_____

[2] Unless otherwise indicated, section references are to the Internal Revenue Code (Code) applicable to the relevant years, Rule references are to

*Our Country Home Enterprises, Inc., docket No. 25764–10*

| Year | Deficiency | Accuracy-related penalties | |
|------|-----------|------------|------------|
| | | *Sec. 6662(a)* | *Sec. 6662A* |
| 2005 | $114,549 | $22,910 | -0- |
| 2006 | 193,029 | 38,606 | -0- |
| 2007 | 45,184 | -0- | $15,750 |

*Blakes, docket No. 25765–10*

| Year | Deficiency | Accuracy-related penalties | |
|------|-----------|------------|------------|
| | | *Sec. 6662(a)* | *Sec. 6662A* |
| 2005 | $276,032 | $55,206 | -0- |
| 2006 | 402,643 | 80,529 | -0- |
| 2007 | 428,303 | -0- | $85,660 |

*Netversity, Inc., docket No. 11520–11*

| Year | Deficiency | Accuracy-related penalty |
|------|-----------|------------|
| | | *Sec. 6662(a)* |
| 2006 | $9,872 | $1,974 |

*Mejias, docket No. 11521–11*

| Year | Deficiency | Accuracy-related penalty |
|------|-----------|------------|
| | | *Sec. 6662(a)* |
| 2006 | $14,000 | $2,800 |

*Abramos, docket No. 12744–11*

| Year | Deficiency | Accuracy-related penalties | |
|------|-----------|------------|------------|
| | | *Sec. 6662(a)* | *Sec. 6662A* |
| 2005 | $92,218 | $18,444 | -0- |

the Tax Court Rules of Practice and Procedure, and dollar amounts are rounded to the nearest dollar. We interchangeably use the terms "insurance contract" and "insurance policy" for convenience and do not intend to signify a distinction by our use of either term. We also use the terms "welfare benefit plan" and "plan" for convenience and do not intend to suggest for Federal income tax purposes that any of the subject arrangements are either bona fide plans or welfare benefit plans. We use the name "Sterling Plan" to refer to both the plan and the trust that make up the Sterling Plan.

*Abramos, docket No. 12744–11*

| | | Accuracy-related penalties | |
|---|---|---|---|
| Year | Deficiency | Sec. 6662(a) | Sec. 6662A |
| 2006 | 116,844 | 23,369 | -0- |
| 2007 | 123,201 | 651 | $40,920 |

*Browns, docket No. 12745–11*

| | | Accuracy-related penalties | |
|---|---|---|---|
| Year | Deficiency | Sec. 6662(a) | Sec. 6662A |
| 2005 | $96,299 | $19,260 | -0- |
| 2006 | 133,582 | 26,716 | -0- |
| 2007 | 136,910 | -0- | $45,584 |

*Tomassettis, docket No. 12746–11*

| | | Accuracy-related penalties | |
|---|---|---|---|
| Year | Deficiency | Sec. 6662(a) | Sec. 6662A |
| 2005 | $90,543 | $18,109 | -0- |
| 2006 | 122,376 | 24,475 | -0- |
| 2007 | 125,325 | -0- | $42,593 |

The deficiencies stem from petitioners' participation in the Sterling Benefit Plan (Sterling Plan), a purported welfare benefit plan. The parties have selected these seven cases to serve as test cases for issues related to the Sterling Plan. The parties in approximately 40 other cases pending before the Court have agreed to be bound by one or more of the final decisions in these cases.

Petitioners in two of these test cases are Mr. Blake and his wholly owned C corporation, Our Country Home Enterprises, Inc. (Our Country). Respondent disallowed deductions of $450,000, $450,000, and $150,000 that Our Country claimed for 2005, 2006, and 2007, respectively (subject years), with respect to payments that it made to the Sterling Plan. Respondent determined that the Blakes realized income of $765,692, $1,127,853, and $1,199,727 for the subject years from Mr. Blake's participation in the Sterling Plan.

Petitioners in two of the other test cases are Mr. Mejia and his wholly owned C corporation, Netversity, Inc. (Netversity). Respondent disallowed a $50,000 deduction that Netversity claimed for 2006 with respect to a payment that it made to

the Sterling Plan. Respondent determined that the Mejias realized $50,000 of income for 2006 from Mr. Mejia's participation in the Sterling Plan.

Petitioners in the remaining three test cases are Mr. Abramo, Mr. Brown, and Mr. Tomassetti, the equal owners of Code Environmental Services, Inc. (Environmental), an S corporation. Respondent disallowed deductions of $220,588, $236,667, and $237,309 that Environmental claimed for 2005, 2006, and 2007, respectively, with respect to payments that it made to the Sterling Plan and increased each Environmental owner's income by his share of the deductions. [3] For the subject years, the owners' shares of the disallowed deductions were $73,529, $78,889, and $79,102 in the case of Mr. Abramo; $73,529, $78,889, and $79,103 in the case of Mr. Brown; and $73,529, $78,889, and $79,103 in the case of Mr. Tomassetti. Respondent also determined that each owner realized income from his participation in the Sterling Plan. For the respective years, this income was $188,797, $266,299, and $302,968 in the case of Mr. Abramo; $222,089, $304,978, and $346,515 in the case of Mr. Brown; and $199,454, $279,637, and $318,594 in the case of Mr. Tomassetti.

We decide the following issues:

(1)   whether the life insurance policies issued on the lives of the shareholder/employees incident to their participation in the Sterling Plan were part of a split-dollar life insurance arrangement. We hold they were;

(2)   whether the corporate employers may deduct their payments to the Sterling Plan. We hold they may not;

(3)   whether the shareholder/employees must recognize income from their participation in the Sterling Plan. We hold they must to the extent stated;

---

[3] Former secs. 6241–6245 generally required that the shareholders of an S corporation challenge the Commissioner's adjustments to an S corporation's income in a single, corporate-level proceeding. However, the Small Business Job Protection Act of 1996, Pub. L. No. 104–188, sec. 1307(c)(1), 110 Stat. at 1781, repealed those provisions for taxable years beginning after December 31, 1996. Respondent's adjustments to Environmental's income are therefore properly before us in this proceeding as adjustments to the income of Environmental's owners.

(4)   whether petitioners are liable for the accuracy-related penalties that respondent determined under section 6662(a). We hold they are; and

(5)   whether Our Country, the Abramos, the Browns, and the Tomassettis are liable for the accuracy-related penalties that respondent determined under section 6662A. We hold they are.

FINDINGS OF FACT

I. *Background*

Some of the facts have been stipulated. The stipulations of fact and the facts drawn from stipulated exhibits are incorporated herein, and we find those facts accordingly. The parties have stipulated that an appeal of any or all of these cases would be to the Court of Appeals for the Seventh Circuit.

II. *Petitioners and Related Entities*

A. *Our Country*

Our Country is a C corporation. Its business involves the manufacture and sale of store fixtures and the sale of antiques. It had eight full-time employees in each subject year. It had a post office box in Indiana that was its mailing address when its petition was filed.

B. *Blakes*

The Blakes are husband and wife. They resided in Ohio when their petition was filed.

Mr. Blake was born on June 11, 1949, and graduated from college in 1971 with a degree in American history and government. He later worked for 24 years as a high school teacher, teaching American history, government, geography, psychology, sociology, and world history. He also worked in various nonprofessional jobs (e.g., as an antique dealer and as an auctioneer) during the summers of those 24 years.

Mr. Blake started Our Country's business incident to his dealing in antiques. He began working for Our Country on March 8, 1985, the day it was incorporated. He was the sole owner and president of Our Country during the subject years.

### C. *Netversity*

Netversity is a C corporation. It had a mailing address in California when its petition was filed. Netversity is in the business of computer programming and consulting with respect to Internet applications. It had one to three full-time employees in 2006.

### D. *Mejias*

The Mejias are husband and wife. They resided in California when their petition was filed.

Mr. Mejia has a bachelor of science degree in electrical engineering. He worked in both the restaurant and banking businesses upon graduating from college. He later worked in an information systems management business.

Mr. Mejia established Netversity in 1998, and he has worked there since. He was Netversity's sole owner and president during 2006.

### E. *Environmental*

Environmental is an S corporation. It is an environmental remediation company that cleans up contaminated sites.

Mr. Abramo, Mr. Tomassetti, and Mr. Brown equally own Environmental. Mr. Tomassetti generally manages the financial side of Environmental's business. Environmental's other two owners manage its sales and nonfinancial operations.

During the subject years Environmental employed approximately 25 individuals, including its owners. Fifteen of Environmental's employees, including the owners, participated in the Sterling Plan.

### F. *Abramos*

The Abramos are husband and wife. Mr. Abramo was born in August 1958. They resided in New Jersey when their petition was filed.

### G. *Tomassettis*

The Tomassettis are husband and wife. They resided in New Jersey when their petition was filed.

Mr. Tomassetti was born on September 23, 1956. He holds both a bachelor of science and a master's degree in geology. He began working for Environmental in 1989. Before that, he

worked as a geologist in the environmental industry and for two years worked as a financial planner.

### H. *Browns*

The Browns are husband and wife. They resided in New Jersey when their petition was filed.

Mr. Brown was born on December 18, 1952.

## III. *Mr. Snyder and His Related Entities*

### A. *Mr. Snyder*

Ronald H. Snyder graduated from law school in 1982 and is admitted to the Utah State Bar. He is also licensed in various States to work as a third-party administrator and as an insurance salesman. [4] He was both a licensed and enrolled actuary from 1975 until recently.

Mr. Snyder has worked with pension plans for over 30 years, and he holds himself out as a specialist in, among other things, welfare benefit plans and the tax and labor aspects of employee benefit plans. Mr. Snyder was the actuary for the Sterling Plan from its inception, and he performed annual calculations, including valuations, for the plan which he shared with its participating employers. None of these valuations was peer reviewed.

### B. *BCA and BSGLLC*

During the subject years Mr. Snyder and his family owned Benefits for Corporate America, Inc. (BCA), of which Mr. Snyder was president. Mr. Snyder and his wife, Christine, also owned a limited liability company named Benefit Strategies Group, LLC (BSGLLC). BSGLLC is a third-party administrator firm of which Mr. Snyder is the managing member.

Benefit Strategies Group, Inc. (BSG), was Sterling Plan's administrator from at least January 1, 2003, through the end of 2004. Mr. Snyder was BSG's president. Between January 1, 2005, and the end of the first quarter of 2007, BSGLLC purchased some of BSG's assets, and BCA was Sterling Plan's administrator from on or about January 1, 2005,

---

[4] A third-party administrator administers benefit plans.

through 2007. BCA was also Sterling Plan's sponsor during the subject years.

## IV. *Sterling Plan*

### A. *Background*

In the early 1990s Mr. Snyder and two other attorneys began looking for a way for employers to fund greater benefits than pension plans allowed. Mr. Snyder established the Sterling Plan in October 2002 as a way for employers to fund and receive those greater benefits. During the first part of the subject years, the Sterling Plan's trustee was Fifth Third Bank of Florida. National Advisers Trust was the Sterling Plan's trustee during the rest of the subject years.

The Sterling Plan ostensibly operates as a single welfare benefit plan which is an aggregation of separate multiple single employer welfare benefit plans under section 419(e). The Sterling Plan offers to pay various benefits, primarily death, medical, and disability benefits, during a participating employee's current employment and/or retirement.[5] The Sterling Plan lets each participating employer select the extent of those benefits to be provided under a personal plan that the employer establishes to apply to its employees alone as part of the Sterling Plan. The Sterling Plan lets the employer select the general provisions applicable to its plan (e.g., the normal and early retirement dates, the number of annual hours that its employees must work to earn benefits under the plan), the participation requirements (e.g., minimum age, minimum number of years that its employees must work for the employer), and the vesting schedule for the benefits payable under the employer's plan.

A participating employer makes payments to the Sterling Plan that are used to fund the benefits that the Sterling Plan promises to pay to the employer's participating employees. The payments may revert to the employer only in the atypical case where the payment results from a mistake of fact. Each employer singlehandedly sets the amount and the frequency of its payments to the Sterling Plan and the eligibility requirements for its employees to participate in the

---

[5] The medical benefits under the Sterling Plan covered medical expenses that were not covered by Medicare, by an employer-provided health insurance policy, or by any other plan of health insurance.

Sterling Plan. Employees may (but are not required to) make payments to the Sterling Plan if their employer lets them, and any such payment that an employee makes is credited to his or her personal account that is maintained under the plan.

B. *Operation*

BSG and BCA executed revised and restated master plan documents for the Sterling Plan as of January 1, 2003, September 1, 2005, January 1, 2006, January 1, 2007, and August 1, 2007. These documents stated that employers established or adopted welfare benefit plans pursuant to the terms of the documents by executing adoption agreements. The adoption agreements let the employers set the specific provisions that applied to their plans.

For each participating employer's plan, the Sterling Plan maintains individual personal accounts for each of the employer's participating employees. An employer's payments to the Sterling Plan are apportioned into each of these accounts to provide benefits to the corresponding employee, to his or her dependent, and to his or her beneficiary. An employer may allow its employees to direct the investments of the funds in their accounts, and the balance in each account is adjusted as of each valuation date to reflect the investment earnings or losses with respect to the funds in the account. The amount in a nonvested account of any employee who terminates his or her employment with the employer is reallocated to the accounts of the employer's remaining participating employees. The Sterling Plan will pay an employee the death, medical, and disability benefits that his or her employee selects only to the extent of the amount in the employee's account.

The Sterling Plan purchases a variety of life insurance products, including individual policies, group policies, cash value policies, and term policies in order to fund any benefit payable to the employees. Typically, the employer selects the insurance policies that it wants to use to fund the benefits payable to its employees, and each insurance policy that is purchased funds all of the benefits that are payable as to the employee covered by that policy. As of each valuation date, the administrator adds to an employee's personal account the increase in cash value of any insurance policy that the Ster-

ling Plan holds with respect to the employee. The Sterling Plan does not set aside any specific amount as reserves for the postretirement benefits, and the Sterling Plan does not keep any payment that it receives for post-retirement benefits in a separate bank account.

A participating employee may designate the beneficiary or beneficiaries to receive the death benefits payable under the Sterling Plan and the death proceeds of any life insurance policy maintained on the life of the employee. The amount of the death benefit payable as to an employee is the face amount of the insurance policy on the employee's life, and that death benefit is payable in accordance with the terms of the insurance policy. An employee upon retiring from employment with the employer may elect to receive the paid-up life insurance policy in satisfaction of a retirement death benefit.

An employer at any time may discontinue making payments to the Sterling Plan or otherwise may terminate its participation in the Sterling Plan. If an employer does either, all amounts credited to an employee's personal account become fully vested and the employer may not receive a refund or any other benefit. In the case of a termination, the administrator may distribute the assets in the employer's plan to the participants or to their beneficiaries or generally direct that the assets remaining in the plan be applied to provide the employees or their beneficiaries with the benefits selected by the employer. If an employer stops making payments to the Sterling Plan, the employer may direct that the trustee (1) retain the plan assets for the employees pursuant to the provisions of the plan, (2) transfer the plan assets to a successor trustee, or (3) retain the assets for the benefit of the employees.

Employers adopting the Sterling Plan were advised in writing that they might want to consult with various professionals (including attorneys and accountants) regarding their participation in the plan.

V. *Our Country and the Blakes*

A. *Mr. Blake's Learning of the Sterling Plan*

1. *Mr. Ringger and Mr. Reckard*

Steven R. Ringger is a certified public accountant (C.P.A.) who prepared the Blakes' and Our Country's income tax returns for the subject years. Mr. Ringger recommended the Sterling Plan to Mr. Blake before 2003. Mr. Blake disregarded that recommendation because Mr. Ringger was not a financial planner.

Mr. Blake eventually invested in the Sterling Plan upon the recommendations of Corey Reckard, a C.P.A., who worked as an insurance agent/financial planner, and one of Mr. Reckard's colleagues, Daniel Weilbaum. Mr. Blake and Mr. Reckard had been discussing Mr. Blake's potential investment in life insurance (or in a similar product), and Mr. Reckard stressed to Mr. Blake that the Sterling Plan would allow him to accumulate value with favorable tax consequences and receive life insurance at no cost. Mr. Blake considered the Sterling Plan primarily to be a good financial investment and a way to defer taxes. Mr. Blake also viewed the Sterling Plan as a way to obtain long-term life insurance for himself and for his employees.

Mr. Blake invested in the Sterling Plan, relying to a significant extent on his belief that Mr. Reckard was a licensed insurance agent who would not sell him an illegitimate product. Mr. Blake also presumed that Guardian Life Insurance Co. of America (Guardian), the insurance company that would issue the insurance on the lives of Our Country's participating employees, was a licensed insurance company. Mr. Ringger did not advise either Our Country or the Blakes concerning their participation in the Sterling Plan.

2. *Mr. Penner*

Ted Penner is an experienced lawyer/C.P.A. and Mr. Blake's longtime acquaintance. Mr. Penner specializes to a significant extent in estate planning. Mr. Penner had a history of rendering legal and business consulting services to Mr. Blake and Our Country, respectively,[6] when Mr. Blake

---

[6] Among other things, Mr. Penner helped Mr. Blake start a family foundation.

told Mr. Penner that he had invested in the Sterling Plan and wanted his advice as to that investment. Mr. Blake and Mr. Penner briefly discussed the Sterling Plan at that time. Mr. Penner is not an expert in welfare benefit plans; he does not purport to be an expert in welfare benefit plans; and he did not tell Mr. Blake that he was an expert in welfare benefit plans or in employee benefits. Mr. Penner has a limited knowledge and understanding of welfare benefit plans, and he considers them to be complex.

In October 2004 after Mr. Blake had been in the Sterling Plan for approximately one year, Mr. Blake gave Mr. Penner certain documents relating to the Sterling Plan and they again discussed the plan but this time in more depth. Their discussion in 2004 occurred after Mr. Blake was contacted by both Mr. Reckard and promoters of other plans.[7] In or around October 2004 Mr. Penner informed Mr. Blake that his investment in the Sterling Plan would give him tax deductions and eventually lead to his receipt of his life insurance policy, but Mr. Penner did not tell Mr. Blake that the tax deductions were legitimate or whether the right to receive his insurance policy came with any unfavorable consequences. Mr. Penner advised Mr. Blake that the Sterling Plan from a conceptual point of view was beneficial to his long-term estate plans but was a risky venture. Mr. Penner did not review the actuarial computations or the annual reports that the Sterling Plan gave to Our Country, and he did not perform any reference checks on the Sterling Plan.

B. *Adoption Agreements*

1. *Background*

Our Country adopted the Sterling Plan as of December 2, 2003, and participated in the plan throughout the subject years. Our Country's single employer plan was called the Our Country Home, Inc. Employee Welfare Benefit Plan.

---

[7] At or about the same time or shortly thereafter, Mr. Blake was told that the Sterling Plan was a "listed transaction" (discussed *infra*) and that the main purpose of the plan was to generate the payment of commissions on the sale of the related insurance policies. Mr. Blake discussed the matter with Mr. Ringger, Mr. Reckard, and at least one other individual. Mr. Blake considered terminating Our Country's participation in the Sterling Plan but decided to stay with the plan.

During 2004 and 2005 the trustee of Our Country's plan was Fifth Third Bank of Florida. During 2007 and most (if not all) of 2006 the trustee of Our Country's plan was National Advisors Trust. The trust underlying Our Country's plan was neither a voluntary employee beneficiary association under section 501(c)(9) nor a grantor trust under sections 671–679.

Our Country elected to make payments to the Sterling Plan in amounts that it desired. Our Country's funding policy as to the Sterling Plan allowed its portion of the plan's funds to be invested in the cash values of permanent life insurance policies and in variable annuities, mutual funds, interest-bearing checking and savings accounts, and stocks and bonds. Our Country employees did not make any payment to the Sterling Plan.

### 2. *Initial Adoption Agreement*

In its adoption agreement Our Country selected the pre- and the post-retirement death benefit options. Our Country selected a preretirement death benefit of 20 times compensation and did not provide a formula for determining the post-retirement death benefit. Our Country set the normal retirement age at 59, with 5 years of participation. Mr. Blake selected his wife as his beneficiary under the Sterling Plan.

### 3. *Second Adoption Agreement*

On December 28, 2005, Our Country completed a second adoption agreement with an effective date of January 1, 2005. Our Country selected pre- and post-retirement death benefit options and pre- and post-retirement death benefits of 20 times compensation.

### 4. *Third Adoption Agreement*

On July 30, 2006, Our Country completed a third adoption agreement with an effective date of January 1, 2005. Our Country selected pre- and post-retirement death benefit options and the medical benefit option.[8] Our Country selected pre- and post-retirement death benefits of 20 times compensation.

_____

[8] During the subject years no Our Country employee received from the Sterling Plan any payment for medical expenses.

In the third adoption agreement Our Country changed the normal retirement age to 57, with 15 years of participation. Mr. Blake was then 57 years old, and the Sterling Plan reported him as 100% vested in his benefits following the change to the retirement age. By virtue of this change, Mr. Blake, upon retiring, was considered entitled to receive his paid-up life insurance policy from the Sterling Plan in full settlement of the life insurance benefits payable under the Sterling Plan.

C. *Life Insurance Policies*

1. *Background*

Our Country Home, Inc. Employee Welfare Benefit Plan Trust purchased life insurance policies on the lives of Our Country's employees, including Mr. Blake, with the payments that Our Country made to the Sterling Plan (for the benefit of the Our Country Home, Inc. Employee Welfare Benefit Plan).[9] Those policies were purchased from Guardian. Mr. Reckard was the insurance agent who arranged the purchases of the policies.

2. *Blake Policy*

One insurance policy was taken out on the life of Mr. Blake (Blake policy). This insurance policy was issued on January 27, 2004, as a whole life insurance policy with a face amount of $6.9 million. Both the owner and the beneficiary of this insurance policy were stated to be Fifth Third Bank of Florida, as trustee of the Sterling Plan.

On the application for life insurance, Mr. Blake was required to, and did, answer various personal questions such as whether he intended to travel outside the United States; whether he had smoked or used tobacco products within the last two years; whether he had been charged with any motor vehicle moving violation or had had his driver's license suspended or revoked within the last five years; and whether within the last three years he had participated in any high-adventure activity such as piloting an aircraft, scuba diving, rock or mountain climbing, hang gliding, parachuting, or

---

[9] To the extent that the employer's payments to the Sterling Plan exceeded the cost of the insurance, the Sterling Plan invested those excess proceeds as directed by the employer.

motor vehicle racing. Mr. Blake also had to answer questions about his and his family's medical history and to support those answers with the signature of a medical examiner. Guardian further required that Mr. Blake undergo a medical examination and that the results of that examination, as well as a copy of Mr. Blake's driving record, be submitted as part of the application for the insurance policy. Guardian rated (e.g., as preferred, preferred plus, and class 6) Mr. Blake (and Our Country's other employees who applied for insurance) for purposes of setting the premium payable on his (and their respective) insurance policy. Guardian rated Mr. Blake as a "class 6" [10] and offered to shop for reinsurance to lower the premium that would be attributable to that rating.

On or about April 11, 2006, the owner of the Blake policy was changed from the trust for the Sterling Plan to the trust for the Our Country Home, Inc. Welfare Benefit Plan.

### 3. *Other Policies*

From 2005 through 2007 seven of Our Country's employees (including Mr. Blake) participated in the Sterling Plan through the Our County Home, Inc. Welfare Benefit Plan. The other employees were Cindy Blake, Hope Holley, Sasha Hullinger, Chris Rohrbaugh, Randel Straka, and Elizabeth Krohn. The Sterling Plan purchased cash value life insurance policies for each of these employees but for Cindy Blake.

### D. *Payments and Valuation*

### 1. *2005*

On December 28, 2005, Our Country paid $450,000 to Fifth Third Bank of Florida. The Sterling Plan treated this payment as an employer contribution to the Our County Home, Inc. Welfare Benefit Plan. On or after August 3, 2006, Mr. Snyder gave Mr. Blake, in his capacity as Our Country's president, an "amended annual valuation report" showing that the amount of the allowable contribution was $450,000.

The Sterling Plan initially used $32,061 of the $450,000 to pay the premium on additional paid-up insurance on the Blake policy. The Sterling Plan later used $417,245 of the $450,000 to pay the premiums on the life insurance policies

---

[10] While the record does not establish the meaning of a class 6 rating, we understand it to be lower than a rating of preferred or preferred plus.

covering all of Our Country's employees (including Mr. Blake). Of the $417,245, $323,606 was paid on the Blake policy.

Under the Sterling Plan, as of December 31, 2005, both the pre- and the post-retirement death benefits payable on the Blake policy were $6.9 million. As of December 10, 2005, the cash value of the Blake policy was $90,694.

2. *2006*

On December 27, 2006, Our Country paid $450,000 to National Advisors Trust, Inc. The Sterling Plan treated this payment as an employer contribution to the Our County Home, Inc. Welfare Benefit Plan. On March 21, 2008, Mr. Snyder gave Mr. Blake, in his capacity as Our Country's president, an "amended annual valuation" for the 2006 plan year showing that the amount of the allowable contribution was $325,590.

The Sterling Plan initially used $59,268 of the $450,000 paid in 2006 to pay the premium on additional paid-up insurance on the Blake policy. The Sterling Plan later used $390,732 of the $450,000 to pay the premiums on the life insurance policies covering all of Our Country's employees, including Mr. Blake. Of the $390,732, $323,606 was paid on the Blake policy.

Under the Sterling plan, as of December 31, 2006, both the pre- and the post-retirement death benefits payable on the Blake policy were $6.9 million. As of December 10, 2006, the cash value of the Blake policy was $331,364.

3. *2007*

On December 27, 2007, Our Country paid $150,000 to National Advisors Trust. The Sterling Plan treated $124,179 of the $150,000 as an employer contribution to the Our County Home, Inc. Welfare Benefit Plan. On March 21, 2008, Mr. Snyder gave Mr. Blake, in his capacity as Our Country's president, an "annual valuation" for the 2007 plan year showing that the amount of the allowable contribution was $124,179.

The Sterling Plan did not use any of the $150,000 to pay a life insurance premium. Instead, an insurance policy loan was extended to cover the premium. The Plan eventually

used the $150,000 payment to repay a portion of the insurance policy loan on the Blake policy.

Under the Sterling plan, as of December 31, 2007, both the pre- and the post-retirement death benefits payable on the Blake policy were $6.9 million. As of December 10, 2007, the cash value of the Blake policy was $616,612.

### E. *Death Benefits of Employees Other Than Mr. Blake*

Our Country employees other than Mr. Blake also were entitled to pre- and post-retirement death benefits in each subject year. The death benefits for those employees were the same amount in each year and equaled the face amount of the life insurance policy taken out on his or her life as to each employee. Hope Holley's benefit was $575,000. Sasha Hullinger's benefit was $969,600. Chris Rohrbaugh's benefit was $880,000. Randel Straka's benefit was $946,000. Elizabeth Krohn's benefit was $467,600.

### F. *Tax Return Information*

### 1. *Our Country*

### a. *2005*

Our Country filed a Form 1120, U.S. Corporation Income Tax Return, for 2005. In that return Our Country claimed a $450,000 deduction for "employee benefit programs". Our Country did not disclose its participation in the Sterling Plan. Our Country reported that it had a taxable loss of $113,091 and that its Federal income tax was zero.

### b. *2006*

Our Country filed a Form 1120 for 2006. In that return Our Country deducted $450,000 for pension (or similar type of) plans. Our Country did not disclose its participation in the Sterling Plan. Our Country reported taxable income of $14,378 and Federal income tax of $2,157.

### c. *2007*

Our Country filed a Form 1120 for 2007. In that return Our Country deducted $150,000 for pension (or similar type of) plans. Our Country did not disclose its participation in the Sterling Plan. Our Country reported taxable income of $14,310 and Federal income tax of $2,147.

On January 25, 2010, Our Country filed a Form 1120X, Amended U.S. Corporation Income Tax Return, for 2007. The only change reported on the amended return was the addition of a Form 8886, Reportable Transaction Disclosure Statement, disclosing as a "Protective Filing" Our Country's participation in the Sterling Plan.

2. *The Blakes*

a. *2005*

The Blakes filed a joint Federal income tax return for 2005. They did not report any income related to Mr. Blake's participation in the Sterling Plan, and they did not disclose his participation in the Sterling Plan. The Blakes reported taxable income of $534,612 and total Federal income tax of $160,645.

b. *2006*

The Blakes filed a joint Federal income tax return for 2006. They did not report any income related to Mr. Blake's participation in the Sterling Plan, and they did not disclose his participation in the Sterling Plan. The Blakes reported taxable income of $632,633 and total Federal income tax of $194,034.

c. *2007*

The Blakes filed a joint Federal income tax return for 2007. They did not report any income related to Mr. Blake's participation in the Sterling Plan, and they did not disclose his participation in the Sterling Plan. The Blakes reported taxable income of $1,699,092 and total Federal income tax of $562,277.

G. *Deficiency Notices*

On August 19, 2010, respondent mailed a deficiency notice to the Blakes for the subject years. On the same day respondent mailed a deficiency notice to Our Country for the same years. The deficiency notice mailed to Our Country stated in relevant part that respondent had disallowed Our Country's claimed deductions of the $450,000, $450,000, and $150,000 payments for 2005, 2006, and 2007, respectively, that it made to the Sterling Plan because the life insurance

arrangement was a split-dollar insurance arrangement subject to the "economic benefit regime rules", which disallow those deductions. The deficiency notice mailed to the Blakes stated in relevant part that the Blakes realized income of $765,692, $1,127,853, and $1,199,727 for the subject years from Mr. Blake's participation in the Sterling Plan and that the authority for that income was sections 61, 72, 83, and 402(b).

## VI. *Netversity and the Mejias*

### A. *Learning of the Sterling Plan*

Javier Morgan is a C.P.A. He also is Mr. Mejia's uncle. Mr. Morgan has been Mr. Mejia's accountant since 1995 or 1996.

Mr. Morgan told Mr. Mejia in 2005 or 2006 that he should invest in the Sterling Plan as part of his retirement plans. Mr. Mejia (1) did not ask Mr. Morgan whether he was an expert on welfare benefit plans, (2) did not ask Mr. Morgan what he reviewed to recommend the Sterling Plan, and (3) did not receive from Mr. Morgan any written opinion on the Sterling Plan. Mr. Mejia "blindly expected" that he was going to invest money in the Sterling Plan without any tax consequences.

### B. *Adoption Agreement*

#### 1. *Background*

Netversity adopted the Sterling Plan as of January 1, 2006. Netversity's single employer plan was called the Netversity, Inc. Sterling Benefit Plan. The trust underlying Netversity's single employer plan was neither a voluntary employee beneficiary association under section 501(c)(9) nor a grantor trust under sections 671–679. Netversity elected to make discretionary payments to the Sterling Plan, and Mr. Mejia was the only Netversity employee who participated in the Sterling Plan during 2006.

#### 2. *Elections*

In its adoption agreement Netversity selected the pre- and post-retirement death benefit options as well as medical

benefits. [11] Netversity selected a pre- and post-retirement death benefit of seven times annual compensation.

C. *Payment and Valuation*

On December 21, 2006, Netversity paid $50,000 to Fifth Third Bank of Florida, noting that the payment related to the Netversity, Inc. Sterling Benefit Plan. The Sterling Plan treated this payment as an employer contribution to the Netversity account maintained as part of the Sterling Plan. On or after July 6, 2007, Mr. Snyder gave Mr. Mejia on behalf of Netversity an annual valuation report showing that the amount of the allowable contribution was $50,000.

Under the Sterling Plan, as of December 31, 2006, there was neither a pre- nor post-retirement death benefit payable upon Mr. Mejia's death because the Sterling Plan had not yet purchased an insurance policy on his life.

D. *Tax Return Information*

1. *Netversity*

Netversity filed a 2006 Form 1120 claiming a $50,000 deduction for "employee benefit programs". Netversity did not disclose its participation in the Sterling Plan. Netversity reported taxable income of $23,715 and total Federal income tax of $3,557.

2. *Mejias*

The Mejias filed a joint Federal income tax return for 2006. Mr. Morgan prepared the return. The Mejias did not report any income related to Mr. Mejia's participation in the Sterling Plan, and they did not disclose his participation in the Sterling Plan. The Mejias reported taxable income of $486,388 and total Federal income tax of $151,304.

E. *Deficiency Notices*

On February 14, 2011, respondent mailed a deficiency notice to the Mejias for 2006. On the same day, respondent mailed a deficiency notice to Netversity for 2006.

The deficiency notice mailed to Netversity stated in relevant part that respondent had disallowed Netversity's

_____

[11] During 2006 no Netversity employee received from the Sterling Plan any payment for medical expenses.

claimed deduction of the $50,000 payment that it made to the Sterling Plan during 2006 because the life insurance arrangement was a split-dollar insurance arrangement subject to the "economic benefit regime rules", which disallow that deduction. The deficiency notice mailed to the Mejias stated in relevant part that the Mejias realized income of $50,000 in 2006 on account of Mr. Mejia's participation in the Sterling Plan and that the authority for that income was sections 61, 72, 79, 83, and 402(b).

VII. *Environmental and Its Owners*

A. *Learning of the Sterling Plan*

1. *Background*

a. *Mr. Scutellaro*

Joseph Scutellaro is a C.P.A. and a general tax practitioner. He has prepared the tax returns of Environmental's owners since 1994 or 1995. He also gave them tax advice during that period. Mr. Tomassetti relied upon Mr. Scutellaro to file his and Environment's tax returns with the understanding that they were in compliance.

b. *Mr. Deavers*

In or about 1995 or 1996 Mr. Scutellaro was introduced to Doug Deavers, a benefits consultant in Naples, Florida, and to the concept of welfare benefit plans. Shortly thereafter, Mr. Tomassetti asked Mr. Scutellaro about ways to provide pretax benefits to employees. Mr. Scutellaro knew that Mr. Deavers offered his clients welfare benefit plans which provided pretax benefits, and Mr. Scutellaro introduced Mr. Tomassetti to Mr. Deavers as a potential investor in one of those plans. Environmental eventually joined one of Mr. Deavers' plans.

On or after July 31, 2000, while Environmental was participating in one of Mr. Deavers' plans, Mr. Deavers concluded from the release of *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98–99 (2000), *aff'd,* 299 F.3d 221 (3d Cir. 2002), and of other then-recent judicial opinions that his plans were no longer or had never been acceptable. Mr. Deavers subsequently contacted Mr. Tomassetti and informed him that he was no longer going to be admin-

istering his plans and introduced Mr. Tomassetti to Mr. Snyder. Mr. Tomassetti then learned about the Sterling Plan. Mr. Tomassetti believed that Mr. Snyder was a recognized professional in the matter of welfare benefit plans, and Mr. Tomassetti and Environmental's other two owners contemplated investing in the Sterling Plan through Environmental.

### c. *Environmental's Owners' Interest in the Sterling Plan*

Mr. Tomassetti was the point person for the Environmental owners regarding their potential investment in the Sterling Plan, and Mr. Tomassetti asked Mr. Scutellaro about the plan before investing in it. Mr. Scutellaro was not an expert in welfare benefit plans, and he did not represent to Mr. Tomassetti that he had expertise with welfare benefit plans. Mr. Scutellaro summarily reviewed the Sterling Plan documents and what he considered to be the applicable provisions of the Code and recommended to Mr. Tomassetti that Environmental switch to the Sterling Plan because Mr. Deavers was no longer supporting the plan that Environmental was then in. Mr. Scutellaro made that recommendation relying primarily on Mr. Snyder's credentials and on certain written information that Mr. Snyder gave to him as to the plan. Mr. Scutellaro knew that the judiciary had sustained the Internal Revenue Service's (IRS) disallowance of employer deductions in "a lot" of similar cases which involved welfare benefits but concluded on the basis of the materials that Mr. Snyder gave him that those cases were factually distinguishable. Mr. Scutellaro never received any tax opinion from anyone other than Mr. Snyder regarding the validity of the Sterling Plan or of the deductibility of the contributions. Mr. Scutellaro never gave to any of Environmental's owners a written tax opinion regarding the validity of the Sterling Plan or of the deductibility of the contributions.

Mr. Tomassetti relied solely on Mr. Scutellaro for advice and did not do any further investigation into the tax consequences of the Sterling Plan. In deciding to participate in the Sterling Plan, Mr. Tomassetti and Mr. Scutellaro relied on representations that Mr. Snyder made.

B. *Adoption Agreements*

1. *Background*

Environmental adopted the Sterling Plan as of November 16, 2004. [12] Environmental's single employer plan was called the Code Environmental Services, Inc. Employee Welfare Benefit Plan. Environmental elected to make payments to the Sterling Plan in amounts that Environmental selected.

In 2004 and 2005 the trustee of the Code Environmental Services, Inc. Employee Welfare Benefit Plan was Fifth Third Bank of Florida. By March 2006 the trustee was National Advisors Trust. The trust underlying Environmental's single employer plan was neither a voluntary employee beneficiary association under section 501(c)(9) nor a grantor trust under sections 671–679.

2. *Initial Adoption Agreement*

In its initial adoption agreement Environmental selected a preretirement death benefit option but did not specify the formula for determining the benefit.

3. *Second Adoption Agreement*

On November 28, 2006, Environmental completed a second adoption agreement, amending its earlier adoption agreement, with an effective date of January 1, 2005. In the second adoption agreement Environmental elected to make discretionary payments to the Sterling Plan. Environmental selected pre- and post-retirement death benefits and medical benefits. [13] Environmental selected pre- and post-retirement death benefits of five times compensation.

---

[12] In 2007 Mr. Scutellaro learned that certain welfare benefit plans were "listed transactions", discussed *infra*, participation in which had to be disclosed on Federal income tax returns. Mr. Snyder gave Mr. Scutellaro a memorandum stating why the Sterling Plan was not a listed transaction subject to that requirement. Mr. Scutellaro and Environmental's owners opted not to disclose their participation in the Sterling Plan solely on the basis of the memorandum.

[13] During the subject years no Environmental employee received from the Sterling Plan any payment for medical expenses.

## C. *Life Insurance Policies*

### 1. *Mr. Abramo*

Fifth Third Bank of Florida purchased a Minnesota Mutual Life Insurance Co. (Minnesota Life) insurance policy on the life of Mr. Abramo (Abramo policy) for the Code Environmental Services, Inc. Employee Welfare Benefit Plan's trust. The Abramo policy was issued on November 13, 1998, and reissued on March 13, 2004, and on January 13, 2005. The Abramo policy as reissued on March 13, 2004, was a variable adjustable life insurance policy with a face amount of $1 million. The beneficiary of the Abramo policy was the Sterling Trust.

On the application for life insurance Mr. Abramo was required to, and he did, answer various personal questions such as whether he intended to travel outside the United States; whether within the last year he had missed any work on account of illness or injury; whether he had been charged with any motor vehicle moving violation or had had his driver's license restricted or revoked within the last five years; and whether within the last five years he had participated in any high-adventure activity such as piloting an aircraft, underwater diving, mountain climbing, hang gliding, or motor vehicle racing. At the end of each subject year, Minnesota Life gave the Sterling Plan "tax information" for that year stating in part that "[o]ur records indicate that the [Abramo] policy listed above provided the insured with life insurance protection as part of a split-dollar arrangement in 2005 [or 2006 or 2007, as applicable]. The IRS requires that the "economic benefit" of this coverage be reported as income for the tax year 2006 [or 2007 or 2008, as applicable]."

As of November 13, 2005, 2006, and 2007, the cash values of the Abramo policy were $174,550, $238,799, and $298,659, respectively.

### 2. *Mr. Brown*

Fifth Third Bank of Florida purchased a Minnesota Life insurance policy on the life of Mr. Brown (Brown policy) for the Code Environmental Services, Inc. Employee Welfare Benefit Plan's trust. The Brown policy was issued on November 13, 1998, and reissued on March 13, 2004, and December 13, 2004. The Brown policy as reissued on March

13, 2004, was a variable adjustable life insurance policy with a face amount of $1 million. The beneficiary of the Brown policy was the Sterling Trust.

On the application for life insurance, Mr. Brown was required to, and he did, answer various personal questions such as whether he intended to travel outside the United States; whether within the last year he had missed any work on account of illness or injury; whether he had been charged with any motor vehicle moving violation or had had his driver's license restricted or revoked within the last five years; and whether within the last five years he had participated in any high-adventure activity such as piloting an aircraft, underwater diving, mountain climbing, hang gliding, or motor vehicle racing. At the end of each subject year, Minnesota Life gave the Sterling Plan "tax information" for that year stating in part that "[o]ur records indicate that the [Brown] policy listed above provided the insured with life insurance protection as part of a split-dollar arrangement in 2005 [or 2006 or 2007, as applicable]. The IRS requires that the "economic benefit" of this coverage be reported as income for the tax year 2006 [or 2007 or 2008, as applicable]."

As of November 13, 2005, 2006, and 2007, the cash values of the Brown policy were $205,689, $276,082, and $341,847, respectively.

### 3. *Mr. Tomassetti*

Fifth Third Bank of Florida purchased a Minnesota Life insurance policy on the life of Mr. Tomassetti (Tomassetti policy) for the Code Environmental Services, Inc. Employee Welfare Benefit Plan's trust. The Tomassetti policy was issued on October 24, 1998, and reissued on November 13, 1998, March 13, 2004, and December 13, 2004. The Tomassetti policy as reissued on March 13, 2004, was a variable adjustable life insurance policy with a face amount of $1 million. The beneficiary of the Tomassetti policy was the Sterling Trust.

On the application for life insurance, Mr. Tomassetti was required to, and he did, answer various personal questions such as whether he intended to travel outside the United States; whether within the last year he had missed any work on account of illness or injury; whether he had been charged with any motor vehicle moving violation or had had his

driver's license restricted or revoked within the last five years; and whether within the last five years he had participated in any high-adventure activity such as piloting an aircraft, underwater diving, mountain climbing, hang gliding, or motor vehicle racing. Mr. Tomassetti also had to answer questions about his and his family's medical history. At the end of each subject year, Minnesota Life gave the Sterling Plan "tax information" for that year stating in part that "Our records indicate that the [Tomassetti] policy listed above provided the insured with life insurance protection as part of a split-dollar arrangement in 2005 [or 2006 or 2007, as applicable]. The IRS requires that the "economic benefit" of this coverage be reported as income for the tax year 2006 [or 2007 or 2008, as applicable]."

As of November 13, 2005, 2006, and 2007, the cash values of the Tomassetti policy were $184,629, $251,559, and $314,120, respectively.

### 4. *T. Tomassetti*

Thomas Tomassetti (T. Tomassetti) was a nonshareholder employee of Environmental. He was born on February 15, 1963.

Fifth Third Bank of Florida purchased a Minnesota Life insurance policy on the life of T. Tomassetti for the Code Environmental Services, Inc. Employee Welfare Benefit Plan's trust. This insurance policy was issued on October 28, 1998, and reissued on March 13, 2004, and on April 13, 2006. This insurance policy as reissued on March 13, 2004, was a variable adjustable life insurance policy with a face amount of $600,000.

On the application for life insurance, T. Tomassetti was required to, and he did, answer various personal questions such as whether he intended to travel outside the United States; whether within the last year he had missed any work on account of illness or injury; whether he had been charged with any motor vehicle moving violation or had had his driver's license restricted or revoked, within the last five years; and whether within the last five years he had participated in any high-adventure activity such as piloting an aircraft, underwater diving, mountain climbing, hang gliding, or motor vehicle racing. T. Tomassetti also had to answer questions about his and his family's medical history. At the end

of each subject year, Minnesota Life gave the Sterling Plan "tax information" for that year stating in part that "Our records indicate that the [T. Tomassetti] policy listed above provided the insured with life insurance protection as part of a split-dollar arrangement in 2005 [or 2006 or 2007, as applicable]. The IRS requires that the "economic benefit" of this coverage be reported as income for the tax year 2006 [or 2007 or 2008, as applicable]."

As of November 13, 2005, 2006, and 2007, the cash values of this insurance policy were $72,212, $90,021, and $105,685, respectively.

### 5. *Other Policies*

In addition to the policies on the lives of Mr. Abramo, Mr. Tomassetti, Mr. Brown, and T. Tomassetti, the Sterling Plan purchased cash value life insurance policies for some of Environmental's other employees. These other employees included Frederick Andlauer, John McGinty, Martin Brubaker, William Dauber, and Warren Libutti.

### D. *Payments and Valuations*

### 1. *2005*

On November 25, 2005, Environmental paid $96,621 to Fifth Third Bank of Florida, as trustee for the benefit of Environmental. On December 9, 2005, Environmental paid $123,967 to Fifth Third Bank of Florida, as trustee for the benefit of Environmental. The Sterling Plan treated the $220,588 in payments ($96,621 + $123,967) as employer contributions. On or after November 15, 2006, Mr. Snyder gave Mr. Tomassetti, on behalf of Environmental, an amended annual valuation report showing that the amount of the allowable contribution for 2005 was $220,588.

The amended annual valuation report states that Environmental paid Mr. Abramo, Mr. Brown, and Mr. Tomassetti $144,000 compensation each for 2005. According to the formula in the second adoption agreement, Mr. Abramo, Mr. Brown, and Mr. Tomassetti were each entitled to a pre- and post-retirement death benefit in 2005 of $720,000 (i.e., five times their compensation of $144,000). Under the Sterling Plan, as of December 31, 2005, both the pre- and post-retire-

ment death benefits payable on each of the Abramo, Brown, and Tomassetti policies were $1 million.

### 2. *2006*

On November 17, 2006, Environmental paid $170,639 to Fifth Third Bank of Florida, as trustee of the Sterling Plan for the benefit of Environmental. On December 15, 2006, Environmental paid $66,028 to Fifth Third Bank of Florida, as trustee of the Sterling Plan for the benefit of Environmental. The Sterling Plan treated the $236,667 in payments ($170,639 + $66,028) as employer contributions. On or after May 15, 2007, Mr. Snyder gave Mr. Tomassetti, on behalf of Environmental, an annual valuation report showing that the amount of the allowable contribution for 2006 was $236,667.

The amended annual valuation report states that Environmental paid Mr. Abramo, Mr. Brown, and Mr. Tomassetti $125,000 compensation each for 2006. According to the formula in the second adoption agreement, Mr. Abramo, Mr. Brown, and Mr. Tomassetti were each entitled to a pre- and post-retirement death benefit in 2006 of $625,000 (i.e., five times their compensation of $125,000). Under the Sterling Plan, as of December 31, 2006, both the pre- and post-retirement death benefits payable on each of the Abramo, Brown, and Tomassetti policies were $1 million.

### 3. *2007*

On December 27, 2007, Environmental paid $237,309 to Fifth Third Bank of Florida, as trustee for the benefit of Environmental. The Sterling Plan treated the $237,309 payment as an employer contribution. On or after May 20, 2008, Mr. Snyder gave Mr. Tomassetti, on behalf of Environmental, an annual valuation report showing that the amount of the allowable contribution for 2007 was $237,309.

The annual valuation report states that Environmental paid Mr. Abramo, Mr. Brown, and Mr. Tomassetti each $235,000 compensation for 2007. According to the formula in the second adoption agreement, Mr. Abramo, Mr. Brown, and Mr. Tomassetti were each entitled to a pre- and post-retirement death benefit in 2007 of $1,175,000 (i.e., five times their compensation of $235,000). Under the Sterling Plan, as of December 31, 2007, both the pre- and post-retirement

death benefits payable on each of the Abramo, Brown, and Tomassetti policies were $1 million. [14]

4. *Payment of Premiums*

During the subject years the payments that Environmental made to the Code Environmental Services, Inc. Employee Welfare Benefit Plan were used, in part, to pay the premiums on the Abramo, Brown, and Tomassetti policies.

E. *Death Benefits of Nonshareholder Employees*

Environmental employees other than the three owners were entitled to pre- and post-retirement death benefits in each subject year. The death benefits for the following employees were the same amount as to each employee in each year and equaled the face amount of the life insurance policy taken out on his or her life: Frederick Andlauer's benefit—$430,000; T. Tomassetti's benefit—$600,000; Sharon Jarmon's benefit—$165,555; John McGinty's benefit—$450,000; David Runyon's benefit—$178,000; Lino Ferrara's benefit—$200,000; Ivona Cwiek's benefit—$146,000; Martin Brubaker's benefit—$850,000; and William Dauber's benefit—$520,000.

In addition to the just-mentioned Environmental employees, Warren Libutti was an Environmental employee from August 1, 1999, through October 21, 2005. For 2005 Mr. Libutti was entitled to pre- and post-retirement death benefits of $475,000. These benefits equaled the face amount of the life insurance policy taken out on his life.

F. *Tax Return Information*

1. *Background*

Mr. Scutellaro's accounting firm prepared Environmental's and its owners' Federal income tax returns for the subject years.

---

[14] While the formula in the second adoption agreement set Mr. Abramo's, Mr. Brown's, and Mr. Tomassetti's death benefits for 2007 at $1,175,000, their death benefits were limited to $1 million because the face value of their life insurance policies was $1 million.

2. *Environmental*

a. *2005*

Environmental filed a 2005 Form 1120S, U.S. Income Tax Return for an S Corporation. Environmental deducted the $220,588 in payments that it made to the Sterling Plan during 2005 and did not disclose its participation in the Sterling Plan.

b. *2006*

Environmental filed a 2006 Form 1120S. Environmental deducted $236,667 for contributions that it made to the Sterling Plan and did not disclose its participation in the Sterling Plan.

c. *2007*

Environmental filed a 2007 Form 1120S. Environmental deducted $237,309 for contributions that it made to the Sterling Plan and did not disclose its participation in the Sterling Plan.

3. *Abramos*

a. *2005*

The Abramos filed a joint Federal income tax return for 2005. In that return the Abramos did not report any income related to Mr. Abramo's participation in the Sterling Plan and they did not disclose his participation in the plan. The Abramos reported ordinary business income of $191,556 as Mr. Abramo's distributive share of income from Environmental. That business income was computed deducting the payments to the Sterling Plan. The Abramos reported taxable income of $170,051 and total Federal income tax of $37,426.

The Abramos filed two Forms 1040X, Amended U.S. Individual Income Tax Returns, for 2005. Neither the first nor the second amended return reflected any change related to Mr. Abramo's participation in the Sterling Plan.

b. *2006*

The Abramos filed a joint Federal income tax return for 2006. The Abramos did not report any income related to Mr. Abramo's participation in the Sterling Plan, and they did not

disclose his participation in the plan. The Abramos reported ordinary business income of $209,871 as Mr. Abramo's distributive share of income from Environmental. That business income was computed deducting the payments to the Sterling Plan. The Abramos reported taxable income of $405,147 and total Federal income tax of $119,088.

The Abramos filed a 2006 Form 1040X. The 2006 amended return did not reflect any change related to Mr. Abramo's participation in the Sterling Plan.

c. *2007*

The Abramos filed a joint Federal income tax return for 2007. In that return the Abramos did not report any income related to Mr. Abramo's participation in the Sterling Plan and they did not disclose his participation in the plan. The Abramos reported ordinary business income of $422,074 as Mr. Abramo's distributive share of income from Environmental. That business income was computed deducting the payments to the Sterling Plan. The Abramos reported taxable income of $378,954 and total Federal income tax of $116,457.

The Abramos filed a 2007 Form 1040X. The 2007 amended return did not reflect any change related to Mr. Abramo's participation in the Sterling Plan.

4. *Browns*

a. *2005*

The Browns filed a joint Federal income tax return for 2005. The Browns did not report any income related to Mr. Brown's participation in the Sterling Plan, and they did not disclose his participation in the plan. The Browns reported ordinary business income of $191,556 as Mr. Brown's distributive share of income from Environmental. That business income was computed deducting the payments to the Sterling Plan. The Browns reported taxable income of $95,192 and total Federal income tax of $19,863.

The Browns filed a 2005 Form 1040X. The 2005 amended return did not reflect any change related to Mr. Brown's participation in the Sterling Plan.

### b. *2006*

The Browns filed a joint Federal income tax return for 2006. The Browns did not report any income related to Mr. Brown's participation in the Sterling Plan, and they did not disclose his participation in the plan. The Browns reported ordinary business income of $209,872 as Mr. Brown's distributive share of ordinary business income from Environmental. That business income was computed deducting the payments to the Sterling Plan. The Browns reported taxable income of $376,541 and total Federal income tax of $109,079.

The Browns filed a 2006 Form 1040X. The 2006 amended return did not reflect any change related to Mr. Brown's participation in the Sterling Plan.

### c. *2007*

The Browns filed a joint Federal income tax return for 2007. The Browns did not report any income related to Mr. Brown's participation in the Sterling Plan, and they did not disclose his participation in the plan. The Browns reported ordinary business income of $422,074 as Mr. Brown's distributive share of income from Environmental. That business income was computed deducting the payments to the Sterling Plan. The Browns reported taxable income of $366,691 and total Federal income tax of $112,176.

The Browns filed a 2007 Form 1040X. The 2007 amended return did not reflect any change related to Mr. Brown's participation in the Sterling Plan.

### 5. *Tomassettis*

### a. *2005*

The Tomassettis filed a joint Federal income tax return for 2005. In that return, the Tomassettis did not report any income related to Mr. Tomassetti's participation in the Sterling Plan and they did not disclose his participation in the plan. The Tomassettis reported ordinary business income of $191,556 as Mr. Tomassetti's distributive share of income from Environmental. That business income was computed deducting the payments to the Sterling Plan. The Tomassettis reported taxable income of $132,286 and total Federal income tax of $31,949.

The Tomassettis filed a 2005 Form 1040X. The 2005 amended return did not reflect any change related to Mr. Tomassetti's participation in the Sterling Plan.

b. *2006*

The Tomassettis filed a joint Federal income tax return for 2006. The Tomassettis did not report any income related to Mr. Tomassetti's participation in the Sterling Plan, and they did not disclose his participation in the plan. The Tomassettis reported ordinary business income of $209,872 as Mr. Tomassetti's distributive share of ordinary business income from Environmental. That business income was computed deducting the payments to the Sterling Plan. The Tomassettis reported taxable income of $377,428 and total Federal income tax of $110,928.

The Tomassettis filed a 2006 Form 1040X. The 2006 amended return did not reflect any change related to Mr. Tomassetti's participation in the Sterling Plan.

c. *2007*

The Tomassettis filed a joint Federal income tax return for 2007. In that return the Tomassettis did not report any income related to Mr. Tomassetti's participation in the Sterling Plan and they did not disclose his participation in the plan. The Tomassettis reported ordinary business income of $422,076 as Mr. Tomassetti's distributive share of income from Environmental. That business income was computed deducting the payments to the Sterling Plan. The Tomassettis reported taxable income of $357,456 and total Federal income tax of $112,849.

The Tomassettis filed a 2007 Form 1040X. The 2007 amended return did not reflect any change related to Mr. Tomassetti's participation in the Sterling Plan.

G. *Deficiency Notices*

On March 2, 2011, respondent mailed deficiency notices for the subject years to the Abramos, the Browns, and the Tomassettis.

Each deficiency notice stated in relevant part that respondent had disallowed for the subject years Environmental's claimed deductions of $220,588, $236,667, and $237,309, respectively, for payments that it made to the

Sterling Plan because the life insurance arrangement was a split-dollar insurance arrangement subject to the "economic benefit regime rules", which disallow those deductions. The notices further stated as to this point that respondent had increased the income of each of Environmental's owners by his share of the disallowed deductions and that, for the respective years, the owners' shares of the disallowed deductions were $73,529, $78,889, and $79,103, respectively, in the case of Mr. Abramo; $73,529, $78,889, and $79,103, in the case of Mr. Brown; and $73,529, $78,889, and $79,103 in the case of Mr. Tomassetti.

The deficiency notices also stated in relevant part that each of the three owners had realized income on account of his participation in the Sterling Plan and that the authority for that income was sections 61, 72, 79, 83, 402(b), and 707(c). The notices further stated as to this point that for the respective years, that income was $188,797, $266,299, and $302,968, respectively, in the case of Mr. Abramo; $222,089, $304,978, and $346,515 in the case of Mr. Brown; and $199,454, $279,637, and $318,594 in the case of Mr. Tomassetti.

## OPINION

### I. *Overview*

Our Nation's Federal income tax laws, coupled with the reality that all accessions to wealth are generally reduced significantly by the amount of Federal income taxes imposed thereon, sometimes inspire taxpayers to seek out ways to shelter their income from taxation. Taxpayers have no patriotic responsibility to pay an amount of Federal income tax greater than that which Congress imposes, and taxpayers may structure their business and personal affairs to take advantage of legitimate tax shelters that will reduce the amounts of Federal income tax that they would otherwise pay absent the use of the shelters. *See Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934), *aff'd*, 293 U.S. 465 (1935).

Promoters of tax shelters obviously know that taxpayers generally desire to pay less Federal income tax rather than more, and such promoters regularly devise novel (and on many occasions highly technical) tax shelters which they represent are legitimate tax-saving strategies. As is true when

seeking to enter into any novel or atypical venture, taxpayers seeking to implement a novel or an atypical tax-saving strategy should proceed with caution and with proper independent professional guidance. "[T]hat which we call a rose [b]y any other name would smell as sweet", William Shakespeare, Romeo and Juliet, act 2, sc. 2, 43–44, but a taxpayer's use of an illegitimate tax shelter marketed as a legitimate tax shelter will not. A taxpayer who uses an illegitimate tax shelter may, for example, eventually be called upon to pay not only the Federal income tax that the taxpayer would have paid had the tax shelter not been used, but significant amounts of interest and penalties to boot. While it would be nice if all tax shelters advertised as legitimate tax shelters were indeed legitimate, the fact of the matter is that not all marketed tax shelters are legitimate. Taxpayers who invest in tax shelters should be mindful that the statements of promoters as to the legitimacy of tax shelters carry no weight in the final say as to the true tax consequences that flow from the shelters. For it is only the judiciary that can say definitively that the tax consequences that flow from a promoted tax-savings strategy are indeed legitimate. *Cf. Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

The parties dispute the tax consequences that flow from the Sterling Plan, a plan that promotes the purchase of life insurance products and the payment of commissions thereon in the setting of a coupled tax-saving and tax-deferral strategy. The shareholder/employees generally caused their corporations to invest in the Sterling Plan with the assurance that the investments would safeguard their designated beneficiaries if the shareholder/employees died during the insurance policy year and allow the shareholder/employees to receive the significant cash value of the policies if, as they more likely expected, they did not die during that time. The corporations essentially deducted the payments of the premiums on the life insurance policies through their deductions of their payments to the Sterling Plan, and the shareholder/employees recognized no income corresponding to those deductions. The shareholder/employees, in fact, recognized no income at all from their participation in the Sterling Plan.

Respondent determined that the corporations were not entitled to deduct their payments to the Sterling Plan. Further, respondent determined, the shareholder/employees failed to recognize income from their participation in the Sterling Plan. Petitioners disagree with those determinations and have brought the matter before this Court. In addition, the parties agree that petitioners bear the burden of proof except with respect to the accuracy-related penalties that respondent determined applied to the noncorporate petitioners. Further, the parties agree that the noncorporate petitioners bear the burden of persuasion as to the accuracy-related penalties related to them but that respondent first bears a burden of production as to those items.

## II. *Compensatory Split-Dollar Life Insurance Arrangements*

### A. *Overview*

Respondent determined that Our Country's participation and Environmental's participation in the Sterling Plan are parts of split-dollar life insurance arrangements.[15] To that end, respondent primarily asserts each life insurance arrangement underlying that participation meets the three-prong definition of a "compensatory arrangement" set forth in the special rule of section 1.61–22(b)(2)(ii), Income Tax Regs.[16] Petitioners argue that the life insurance arrangements fail all of those prongs. As petitioners see it, the Sterling Plan is a permissible welfare benefit plan that holds the funds and administers the benefits for its participating employers' single employer welfare benefit plans. Petitioners add that a finding that the Sterling Plan is not a permissible welfare benefit plan may result in unfavorable tax consequences to the nonparty employees of Our Country and of Environmental. Petitioners invite the Court to construe the applicable law taking that possibility into account. We con-

---

[15] Respondent does not assert that Netversity's and Mr. Mejia's participation in the Sterling Plan was part of a split-dollar life insurance arrangement. This is most likely because Netversity during or before 2006 did not cause life insurance to be issued as to any of its employees. As discussed *infra*, a split-dollar life insurance arrangement requires the issuance of life insurance.

[16] Respondent argues secondarily that the Sterling Plan is generally a shareholder arrangement under sec. 1.61–22(b)(2)(iii), Income Tax Regs. We need not and do not address that argument.

clude on the basis of a plain meaning application of the law (and with no need to consider or to discuss the consequences of our conclusion for the nonparty employees) that Our Country's participation and Environmental's participation in the Sterling Plan are compensatory arrangements that make them split-dollar life insurance arrangements.

In general, a split-dollar life insurance arrangement is any arrangement between an owner and a nonowner of a life insurance contract that meets the rules set forth in section 1.61–22(b)(1), Income Tax Regs. [17] *See* sec. 1.61–22(b)(1), Income Tax Regs. These rules essentially describe a split-dollar life insurance arrangement as any arrangement between an owner and a nonowner of a life insurance contract, other than an arrangement that is group term life insurance, where one party pays the premiums and is entitled to recover all or a portion of the premiums from the proceeds of the life insurance contract. *See generally Cadwell v. Commissioner*, 136 T.C. 38, 63–64 (2011), *aff'd*, 483 F. App'x 847 (4th Cir. 2012). Section 1.61–22, Income Tax Regs., is effective for split-dollar life insurance arrangements entered into after September 17, 2003, and an arrangement that is "materially modified" after that date is generally considered to be "entered into" after that date. Sec. 1.61–22(j)(1) and (2)(i), Income Tax Regs. The parties agree that the life insurance arrangements at hand were entered into after September 17, 2003, for purposes of section 1.61–22, Income Tax

---

[17] Sec. 1.61–22(b)(1), Income Tax Regs., provides:

A split-dollar life insurance arrangement is any arrangement between an owner and a non-owner of a life insurance contract that satisfies the following criteria—

  (i) Either party to the arrangement pays, directly or indirectly, all or any portion of the premiums on the life insurance contract, including a payment by means of a loan to the other party that is secured by the life insurance contract;

  (ii) At least one of the parties to the arrangement paying premiums under paragraph (b)(1)(i) of this section is entitled to recover (either conditionally or unconditionally) all or any portion of those premiums and such recovery is to be made from, or is secured by, the proceeds of the life insurance contract; and

  (iii) The arrangement is not part of a group term life insurance plan described in section 79 unless the group term life insurance plan provides permanent benefits to employees (as defined in § 1.79–0).

Regs., and that section 1.61–22, Income Tax Regs., applies to these cases. [18]

As an exception to the general rule of section 1.61–22(b)(1), Income Tax Regs., an arrangement between an owner and a nonowner of a life insurance contract is a split-dollar life insurance arrangement if it is either a compensatory arrangement or a shareholder arrangement under the special rules of section 1.61–22(b)(2)(ii) and (iii), Income Tax Regs., respectively. *See id.* subdiv. (i). An arrangement is a compensatory arrangement if it meets each prong of a three-prong test. *See id.* subdiv. (ii). The first prong requires that the arrangement be "entered into in connection with the performance of services and * * * not [as] part of a group term life insurance plan described in section 79". *Id.* subdiv. (ii)(A). The second prong requires that "[t]he employer or service recipient pays, directly or indirectly, all or any portion of the premiums". *Id.* subdiv. (ii)(B). The third prong requires that either "(1) The beneficiary of all or any portion of the death benefit is designated by the employee or service provider or is any person whom the employee or service provider would reasonably be expected to designate as the beneficiary; or (2) The employee or service provider has any interest in the policy cash value of the life insurance contract." *Id.* subdiv. (ii)(C). A compensatory (or shareholder) arrangement that falls within the special rule is a split-dollar life insurance arrangement even if it does not meet the gen-

[18] On September 18, 2013, the Court ordered each party to file a memorandum that set forth their and his understanding of, and positions as to, the issues of fact and law to be decided in these cases. The order stated that the parties were precluded from advancing positions not included in the memorandums. Petitioners filed their memorandum on February 12, 2014, and supplemented their memorandum on March 6, 2014. Petitioners' memorandum, as supplemented, does not challenge the applicability of sec. 1.61–22, Income Tax Regs., to these cases. To the contrary, petitioners' supplement informs the Court that "[p]etitioners agree with Respondent that the arrangements were entered into after September 17, 2003", for purposes of sec. 1.61–22, Income Tax Regs. Petitioners in their opening brief now invite the Court to decide whether the life insurance arrangements involving Environmental were entered into after September 17, 2003, for purposes of the effective date provision. We decline that invitation. Petitioners did not in their memorandum raise the applicability of the referenced regulations as an issue with respect to Environmental, and we therefore consider petitioners to have waived or otherwise to have abandoned any such argument.

eral rule of section 1.61–22(b)(1), Income Tax Regs. *See id.* subdiv. (i).

B. *Owner of Policies*

The owner of a life insurance contract is generally the person that the insurance contract names as the owner. *See id.* para. (c)(1)(i). Notwithstanding this general rule, however, an employer is considered to be the owner of a life insurance contract under a split-dollar life insurance arrangement entered into in connection with the performance of services if the insurance policy is owned by, inter alia, a trust described in section 402(b) or a welfare benefit fund described in section 419(e)(1). *See id.* subdiv. (iii)(A), (C). A nonowner is any person other than an owner of the life insurance policy who has a direct or indirect interest in the insurance policy. *See* sec. 1.61–22(c)(2), Income Tax Regs. The parties agree that the relevant corporate employers here, Our Country and Environmental, are treated as the owners of the life insurance policies at hand for purposes of section 1.61–22(b)(2)(i), Income Tax Regs.

C. *Our Country and Environmental Single Employer Plans*

The life insurance arrangements related to the Our Country and the Environmental single employer plans are split-dollar life insurance arrangements in that they are compensatory arrangements within the meaning of the special rule. They fall within the special rule because each prong of the three-prong test is met as to the arrangements. First, each of those single employer plans provided life insurance benefits to the employees in exchange for their performance of services, and the benefits were not provided as part of a group term life insurance plan described in section 79. Second, each single employer plan paid the premiums on the life insurance policies through the employer's payments to the Sterling Plan. Third, the employees participating in the single employer plans designated the beneficiaries of the death benefits payable under the plans, which in substance were the death benefits payable under the insurance policies. We also find as to the third prong that the employees in each single employer plan had an interest in the cash value of the respective life insurance policies that covered them.

Petitioners argue that the first prong of the three-prong test fails to be met because, they assert, the Sterling Plan is part of a group term life insurance plan within the meaning of section 79. To that end, petitioners assert that the amount of life insurance is based on the compensation paid to the employee, without regard to any employee's health. We disagree with petitioners' assertion that the Sterling Plan's life insurance benefit is part of a group term life insurance plan within the meaning of section 79.

The life insurance policies are not group term life insurance policies for Federal income tax purposes. Section 1.79–1(a), Income Tax Regs., sets forth the conditions that must be met for life insurance to be characterized as group term life insurance, [19] and at least one of those conditions is not met. Specifically, the record does not establish that "[t]he amount of insurance provided to each employee is computed under a formula that precludes individual selection." *Id.* subpara. (4).

The regulations do not define the term "individual selection" for purposes of section 1.79–1(a)(4), Income Tax Regs. As petitioners see it, the amount of insurance that the Sterling Plan provided to each participating employee was computed under a formula that precluded individual selection because the formula mechanically ascertained the amount of that insurance on the basis of each participating employee's compensation. Respondent argues that the amount of insur-

---

[19] Sec. 1.79–1(a), Income Tax Regs., provides:

(a) What is group-term life insurance?—Life insurance is not group-term life insurance for purposes of section 79 unless it meets the following conditions:

(1) It provides a general death benefit that is excludable from gross income under section 101(a).

(2) It is provided to a group of employees.

(3) It is provided under a policy carried directly or indirectly by the employer.

(4) The amount of insurance provided to each employee is computed under a formula that precludes individual selection. This formula must be based on factors such as age, years of service, compensation, or position. This condition may be satisfied even if the amount of insurance provided is determined under a limited number of alternative schedules that are based on the amount each employee elects to contribute. However, the amount of insurance provided under each schedule must be computed under a formula that precludes individual selection.

ance that the Sterling Plan provided to each participating employee depended on individual selection. To that end, respondent asserts the death benefits provided to the shareholder/employees were on many occasions larger than the death benefits as ascertained by the formula. Respondent also states that individual selection is found in the fact that the issuance of the life insurance policies as to each shareholder/employee was based upon the underwriting criteria for that employee.

We conclude that the issuance of the insurance policies on the lives of Our Country and Environmental shareholder/employees (and as it appears on the lives of all of the Our Country and the Environmental participating employees) was based on individual selection. While the employers participating in the Sterling Plan formally set the amount of life insurance provided to their employees as a multiple of compensation, the mere fact that the Sterling Plan stated on its face that it would pay death benefits in amounts that turn on employee compensation does not necessarily mean that the underlying life insurance is group term life insurance. The life insurance issued as to the Our Country and the Environmental shareholder/employees was not group term life insurance given our finding above that the multiple-of-compensation formula did not actually correspond to death benefits payable and otherwise failed to always limit the amount of insurance that actually was provided to those shareholder/employees. *Cf. Towne v. Commissioner*, 78 T.C. 791 (1982) (holding that an insurance policy was not part of a group term life insurance plan because it individually selected only the company's president as a participant to receive excess insurance).

We also agree with respondent's argument that the life insurance related to Our Country and Environmental was not group term life insurance because the issuance of the insurance took into account the personal risks characteristics of at least those corporations' shareholder/employees (and most likely all of those corporations' participating employees). In *Towne v. Commissioner*, 78 T.C. at 799–800, the Court discussed the genesis of the "individual selection" test and noted that individual selection has never been allowed to occur in the case of group term life insurance. The Court explained:

The reason why the insurance industry has traditionally defined group insurance as not including policies of insurance providing for individual selection is that a group insurer has less opportunity to exercise underwriting judgment with respect to particular persons in the group. Group insurance is usually issued without medical examination or other evidence of insurability. If there were no requirement that the amount of insurance per participant be determined under some formula applicable to all the employees, there would necessarily be adverse selection against the insurance company because the older employees and those in poor health would naturally take disproportionately large amounts of insurance. * * * [*Id.* at 799 n.5; citations omitted.]

Guardian and Minnesota Life required that the Our Country and Environmental shareholder/employees tender information on their health, traveling tendencies, and/or driving traits. The need to submit that type of personal information as a condition to receiving the insurance strongly suggests, and we find, that the insurers were exercising underwriting judgment with respect to at least the Our Country and Environmental shareholder/employees in connection with the issuance of the life insurance related to them. This finding is further strengthened by the fact that, in the case of Guardian at least, Guardian specifically rated each of Our Country's participating employees for purposes of setting the premiums payable on their policies and offered to try to find a way to reduce the premium attributable to the Blake policy. The mere fact that an insurer such as Guardian or Minnesota Life may add up the premiums that apply to separate policies that it sells on a specific group of insureds and then tender the total as the amount due on a "group policy" does not necessarily recharacterize the separate policies as part of a single group term life insurance plan. Instead, as we have stated, the exercise of underwriting judgment with respect to the specific persons in a group is indicative of the issuance of individual insurance policies rather than group policies. We hold that the insurance policies at hand are not group term life insurance policies for Federal income tax purposes.[20]

---

[20] The life insurance polices related to Our Country also fail to qualify as group term life insurance because the insurance was not provided in any of the subject years to at least 10 of Our Country's full-time employees. *See* sec. 1.79–1(c)(1), Income Tax Regs. (stating that life insurance fails to qualify as group term life insurance under sec. 79 where the

Continued

Petitioners make no specific argument as to the second prong of the three-prong test. They argue that the third prong is not met because, they assert, the employees do not designate the beneficiaries. Petitioners also assert that the employees have no direct or indirect interest in the life insurance policies, including the cash values thereof. We disagree on both points.

The third prong is met if the employees who participated in the Sterling Plan either designated the beneficiaries of the life insurance policies or had an interest in the cash value of those policies. Our Country and Environmental shareholder/employees both designated the beneficiaries of the death benefit payable under the policies on their lives and had interests in those policies.

The shareholder/employees named the beneficiaries of the death benefits payable under their insurance policies by designating through the Sterling Plan the individuals who would receive the death benefits under the plan, which, in turn were the death benefits under the policy. In addition, those shareholder/employees were assured that their designated beneficiaries would receive any death benefits payable on those policies to the extent that the shareholder/employees died while participants in the plan. Petitioners seek a contrary holding essentially by looking at the life insurance policies through the wider end of a telescope towards its narrower end and seeing that the Sterling Plan is named as the beneficiary on the policies. They conclude from this view that none of the individuals who the participating employees designate to receive the death benefits payable by the Sterling Plan is "[t]he beneficiary of all or any portion on the death benefit" for purposes of section 1.61–22(b)(2)(ii)(C), Income Tax Regs. We, on the other hand, look telescopically at the life insurance benefit from the narrower end towards the wider end, as one commonly does, and see the ultimate recipient of the death proceeds as the person designated by the shareholder/employees. The fact that the

---

insurance is not provided during the calendar year to 10 or more full-time employees). While the regulations go on to state that this 10-or-more employee rule may be avoided where coverage is provided to all full-time employees, *see* sec. 1.79–1(c)(2), Income Tax Regs., the record fails to establish that all of Our Country's full-time employees were covered by the Sterling Plan.

death proceeds from the life insurance policies are funneled through the Sterling Plan to each of the ultimate recipients does not blur our view (or our conclusion) that each of those recipients is the beneficiary of the death benefit for purposes of section 1.61–22(b)(2)(ii)(C), Income Tax Regs. *Cf. Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945) ("To permit the true nature of a transaction to be disguised by mere formalisms * * * would seriously impair the effective administration of the tax policies of Congress."); *Minn. Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938) ("A given result at the end of a straight path is not made a different result because reached by following a devious path."). The light at the end of the tunnel brightly illuminates our conclusion, given that the Sterling Plan would pay no death benefit were it not for the life insurance policies, and the employee to whom a policy relates, rather than the Sterling Plan, is assured of receiving the entire amount that is payable under the terms of the policy.

We also conclude that the shareholder/employees of Our Country and Environmental had interests in the their life insurance policies and the cash values thereof. This conclusion is supported by at least five facts. First, each life insurance policy and any funds related thereto were intended to be received by the corresponding employee or his or her designee(s) and no one else, and those employees were the only ones who had the right to receive or otherwise to redirect to someone else the cash value of the life insurance policies related to them. Second, the employees could elect to receive their policies upon retiring from employment with the employer. Third, the funds in the Sterling Plan could not be accessed by either the employer or by the employer's creditors, and Our Country and the Environmental employees, upon retiring or alternatively upon their employers' ceasing participation in the Sterling Plan, were certain to get those funds in the form of the policies that then passed to the employees. Fourth, a participating employee, before actually receiving the funds in his or her account, could be allowed to direct the investment of those funds and thus enjoy the benefit of any investment gain or suffer the detriment of any investment loss. Fifth, if the participating employee were to die while his or her insurance policy was in force, then the death benefit under that policy would ultimately be paid to

his or her beneficiary in accordance with the terms of the policy.

We also find important to our just-stated conclusion that the plan benefits were set to be fully vested either when a shareholder/employee satisfied the vesting requirements that he or she chose (or possibly could choose) in the name of the employer or when the employer terminated the plan. And as to vesting, the shareholder/employees were not necessarily bound by the vesting requirements that were initially set in their plans. Instead, at their whim they could accelerate or otherwise change the vesting requirements to their preference. In the case of Mr. Blake, for example, he executed an adoption agreement on July 30, 2006, retroactive to January 1, 2005, that lowered the normal retirement age for the employee participants in the Our Country plan and accelerated his complete vesting to the then-present time.

We conclude that the life insurance contracts relating to the Our Country and the Environmental single employer plans were part of split-dollar life insurance arrangements. [21]

D. *Netversity Single Employer Plan*

No life insurance was purchased or outstanding during the subject years as to the Netversity plan. Any arrangement involving Netversity and the Sterling Plan, therefore, was not a split-dollar life insurance arrangement during those years.

III. *Deductions*

A. *Overview*

Respondent argues that the corporate employers may not deduct the payments that funded the life insurance premiums. Petitioners argue that the corporate employers may deduct the payments as ordinary and necessary business expenses under section 162(a). We agree with respondent.

---

[21] Minnesota Life concluded similarly as to the Environmental policies that it issued on the lives of Environmental's owners. Minnesota Life reported to the Sterling Plan that each of those insurance policies was part of a split-dollar life insurance arrangement.

B. *Section 162(a)*

Section 162(a) is generally the primary hurdle that a taxpayer must clear to deduct a business expense. Section 162(a) lets taxpayers deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Under that section, an expenditure is deductible if it is: (1) an expense, (2) an ordinary expense, (3) a necessary expense, (4) paid (in the case of a cash method taxpayer) or incurred (in the case of an accrual method taxpayer) during the taxable year, and (5) made to carry on a trade or business. *See Commissioner v. Lincoln Sav. & Loan Ass'n*, 403 U.S. 345, 352–353 (1971); *Lychuk v. Commissioner*, 116 T.C. 374, 386 (2001).

C. *Our Country and Environmental*

Our Country and Environmental must clear another hurdle in addition to section 162(a). We have held that the life insurance policies related to Our Country and to Environmental are split-dollar life insurance arrangements because they are compensatory arrangements. In the light of this holding, Our Country and Environmental may deduct an expense related to the arrangements only if the deduction meets the rules of section 1.83–6(a)(5), Income Tax Regs. *See* sec. 1.61–22(f)(2)(ii), Income Tax Regs. Section 1.83–6(a)(5), Income Tax Regs., provides that the amount of an allowable deduction in such a situation equals the sum of the amount of income that the employee recognizes under section 1.61–22(g)(1), Income Tax Regs., plus the amount determined under section 1.61–22(g)(1)(ii), Income Tax Regs. Section 1.61–22(g)(1), Income Tax Regs., explains that an employee generally must recognize income upon the transfer to the employee of the ownership of the life insurance policy. Section 1.61–22(g)(1), Income Tax Regs., explains that the amount of that income equals the excess of the fair market value of the life insurance contract over the sum of the amount that the employee pays to the employer to obtain the insurance contract plus the amount of all economic benefits already included in income by the employee.

Our Country and Environmental did not transfer any life insurance policy to their participating employees during the subject years. Nor did the shareholder/employees recognize

any income from their participation in the Sterling Plan. We conclude that Our Country and Environmental may not deduct their payments to the Sterling Plan.

D. *Netversity*

As previously discussed, Netversity's $50,000 payment to the Sterling Plan is not related to a split-dollar life insurance arrangement. While the same rules that apply to Our Country's and to Environmental's deductions of their payments to the Sterling Plan therefore do not apply to Netversity, the result in all three instances is the same.

The Court has repeatedly held in settings similar to Netversity's setting here that section 162(a) does not allow an employer to deduct its payments to a purported welfare benefit plan where the participating employees could receive the value reflected in insurance policies purchased by those plans. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 90–92; *see also White v. Commissioner*, T.C. Memo. 2012–104, 103 T.C.M. (CCH) 1560, 1571–1572 (2012) (and cases cited thereat). The Court found in those cases that the employers' payments were for the personal benefit of the shareholder/employees, that the plans were not intended to provide welfare benefits to the employees, and that the purported welfare benefit plans were a means to transfer funds from the corporations to their shareholders tax free. The Court held that the employers failed to establish that the payments to the plans were ordinary and necessary business expenses deductible under section 162(a).

Although those referenced cases involved the actual purchase of life insurance and Netversity's case does not, the holdings in those cases apply here with equal force. The Sterling Plan was never intended primarily to provide welfare benefits. Instead, as we find, the purpose and the operation of the Sterling Plan were to serve as a tax-free savings device for the shareholder/employees under the guise of possibly providing welfare benefits. *Accord Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 92. While the framer(s) of the Sterling Plan apparently intended that the plan would allow a shareholder to accumulate substantial amounts of cash value tax-free in life insurance policies, while at the same time allowing the corporation to deduct the premium payments with no recognition of income by the employees, the

plan was more transparently designed to serve as a vehicle for distributing corporate earnings to the shareholders without the occurrence of an event that would trigger the payment of a welfare benefit. The fact that employees who were not owners were allowed to participate in the Sterling Plan does not change our view. The benefits payable to those employees were insignificant when viewed in the light of the benefits flowing to the shareholder/employees. We conclude that Netversity may not deduct its $50,000 payment to the Sterling Plan.

IV. *Income*

A. *Our Country and Environmental Employees*

1. *Background*

Respondent argues that the Our Country and the Environmental shareholder/employees must include in income all of the economic benefits that the Sterling Plan provided to them through the life insurance policies related to them. Petitioners argue that none of these employees received an economic benefit during the subject years in excess of the consideration that he or she paid for the benefit. In this vein, petitioners assert, the employees did not have a current or future right to the cash value of the life insurance policies related to them, either by direct receipt of the cash or by causing the cash to be used to pay other benefits provided under the plan. Petitioners also assert that the employees could not cause any of the life insurance policies to be distributed to them. We agree with respondent that the Our Country and the Environmental shareholder/employees must include in income all of the economic benefits that the Sterling Plan provided to them through the life insurance policies related to them.

2. *Economic Benefit Provisions*

a. *Overview*

The Federal income tax consequences of a split-dollar life insurance arrangement are generally determined either through the economic benefit and accompanying provisions of section 1.61–22(d) through (g), Income Tax Regs. (collectively, economic benefit provisions), or through the loan provisions

of section 1.7872–15, Income Tax Regs. (loan provisions). *See* sec. 1.61–22(a)(2), (b)(3)(i), Income Tax Regs. In general, the loan provisions apply where this is a "split-dollar loan" within the meaning of section 1.7872–15(b)(1), Income Tax Regs. Sec. 1.61–22(b)(3)(i), Income Tax Regs. As exceptions to this general rule, the economic benefit provisions apply where there is a split-dollar loan if (1) the employer owns the life insurance contract and the arrangement is entered into in connection with the performance of services or (2) a donor and a donee enter into the arrangement and the donor owns the life insurance contract. *See id.* subdiv. (ii). The economic benefit provisions also apply where there is not a split-dollar loan unless the nonowner of the life insurance contract makes premium payments on the insurance contract as other than consideration for economic benefits. *See* sec. 1.61–22(b)(3)(i), (5), Income Tax Regs. In the case of this latter exception concerning the nonowner's payment of premiums, general tax principles apply to set the Federal tax treatment of the premium payments. *See id.* subpara. (5).

The parties agree that the loan provisions do not apply to these cases.[22] The parties dispute the applicability of the economic benefit provisions, as previously stated. When applicable, the value of the economic benefits provided to a nonowner in a taxable year equals the sum of (1) the cost of current life insurance protection that the nonowner receives during the year; (2) the amount of the insurance policy cash value to which the nonowner has current access during the year (to the extent the amount was not previously included in income), and (3) any other economic benefit provided to the nonowner (to the extent not previously included in income). *See id.* para. (d)(2). The nonowner is treated as having current access to that portion of the insurance policy's cash value (1) to which the arrangement gives the employee a current or future right and (2) that is directly or indirectly currently accessible by the employee, inaccessible by the employer, or inaccessible by the employer's general creditors. *See id.* subpara. (4)(ii).

---

[22] We agree as well. No split-dollar loan is present in these cases because neither the Our Country nor the Environmental employees made payments to their employers for which they expected to be repaid. *See* sec. 1.7872–15(a)(2), Income Tax Regs.

b. *Applicability*

The economic benefit provisions apply to these cases because no split-dollar loans are involved and the employees did not make any premium payments on the insurance contracts. The employers, as the owners of the life insurance contracts, have therefore provided economic benefits to their employees, as the nonowners of the insurance contracts. *See id.* subpara. (1). The employees must recognize the full value of the economic benefits, net of any consideration that the employees paid to their employers for the benefits. *See id.* Where, as here, the arrangement underlying the split-dollar life insurance arrangement is a "compensatory arrangement" within the meaning of the applicable regulations, an employer's provision of the economic benefits to its employees generally is deemed to be the payment of compensation except where the employer is an S corporation that provides the benefits to a 2% shareholder in consideration for services rendered. *See* sec. 1.61–22(d)(1), Income Tax Regs. In the case of such an S corporation, the 2% shareholder is treated as a partner for purposes of applying the employee fringe benefit rules, the economic benefits are categorized as guaranteed payments under section 707(c), and the 2% shareholder must recognize the amount of the guaranteed payments as gross income under section 61(a). *See* secs. 707(c), 1372.

Petitioners argue that the economic benefit provisions are inapplicable because, petitioners state, those provisions are invalid. According to petitioners, the Secretary lacked the authority to prescribe those provisions in that the provisions are inconsistent with "fundamental principles of federal tax law". Petitioners assert that these fundamental principles require, contrary to the economic benefit provisions, that employees be able to compel current distributions of the cash values of the insurance policies in order to have an interest in the values. Petitioners conclude that the shareholder/employees have therefore not realized any of the cash value and need not include that value in income. We disagree that the economic benefit provisions are invalid.

Petitioners' challenge to the economic benefit provisions requires that we apply the two-step analysis of *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837,

842–844 (1984). The U.S. Supreme Court has recently confirmed that this analysis applies to Treasury regulations such as we have here. *See Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44 (2011). The first step of the analysis requires that we decide whether Congress has spoken directly on the matter to which the economic benefit provisions relate. *See Chevron, U.S.A., Inc.*, 467 U.S. at 842–844. If Congress has spoken directly on that matter, then that is the beginning and the end of our inquiry for we must interpret and apply the statute in accordance with the unambiguously expressed intent of Congress. *See id.* We turn to the second step, however, if Congress has not spoken directly on the matter. The second step requires that we decide whether the economic benefit provisions are a reasonable interpretation of the statute which they construe. *See id.* The economic benefit provisions are invalid under the second step only if they are "arbitrary or capricious in substance, or manifestly contrary to the statute." *Mayo Found. for Med. Educ. & Research*, 562 U.S. at 53 (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 242 (2004)).

We start with *Chevron*'s first step. The statutory provision to which the economic benefit provisions primarily relate is section 61(a), which generally defines gross income as "all income from whatever source derived". That section "sweeps broadly" to encompass any accession to a taxpayer's wealth and reflects Congress' use of the full measure of its taxing power. *See United States v. Burke*, 504 U.S. 229, 233 (1992). While our reading of section 61(a) in the light of its broad construction supports the issuance of equally far-reaching regulations on the subject of gross income, we do not find the term "economic benefit" anywhere in section 61(a). We conclude that Congress has not directly spoken on the matter at hand. *Accord Perez v. Commissioner*, 144 T.C. 51, 58–59 (2015) (holding that Congress had not spoken on the definition of a word where the word was undefined in the Code).

We turn to *Chevron*'s second step. The economic benefit provisions, which operate in part to tax accessions to wealth resulting from split-dollar life insurance arrangements, fit reasonably within the wingspan of the broad definition of "gross income" set forth in section 61(a). We find instructive that the economic benefit provisions track longstanding judicial jurisprudence related to section 61(a). Respondent

argues, and we agree, that the economic benefit provisions are reasonably tailored from the economic benefit doctrine applied in cases such as *Brodie v. Commissioner*, 1 T.C. 275 (1942), and *Sproull v. Commissioner*, 16 T.C. 244 (1951), *aff'd*, 194 F.2d 541 (6th Cir. 1952). Those cases hold that the benefit derived from an employer's irrevocable set-aside of money or property as compensation for services rendered is includible in the service provider's gross income at the time of the set aside, where the money or property is beyond the reach of the employer's creditors. *See also Pulsifer v. Commissioner*, 64 T.C. 245 (1975) (applying *Sproull* to hold that taxpayers were currently taxable on prize money that they would receive in the future but which was irrevocably set aside for their benefit). The economic benefit provisions state similarly that a nonowner of a life insurance policy has current access to the portion of the insurance policy's cash value (1) to which the arrangement gives the employee a current or future right and (2) that is directly or indirectly currently accessible by the employee, inaccessible by the employer, or inaccessible by the employer's general creditors. *See* sec. 1.61–22(d)(4)(ii), Income Tax Regs.; *see also id.* subpara. (6), *Example* (*2*) (demonstrating that the split-dollar provisions apply there because the employer and the employer's general creditors cannot access a portion of the cash value). We conclude that the economic benefit provisions are not arbitrary or capricious in substance or manifestly contrary to the statute.

c. *Value of Economic Benefits*

The value of the economic benefits provided to a nonowner in a taxable year equals the sum of (1) the cost of current life insurance protection that the nonowner receives during the year, (2) the amount of the insurance policy cash value to which the nonowner has current access during the year (to the extent the amount was not previously included in income), and (3) any other economic benefit provided to the nonowner (to the extent not previously included in income). *See* sec. 1.61–22(d)(2), Income Tax Regs. The cost of the current life insurance protection takes into account the life insurance premium factors that the Commissioner publishes for this purpose. *See id.* subpara. (3)(ii). The amount of the current life insurance protection is the death benefit of the

life insurance contract (including paid-up additions) reduced by the sum of the amount payable to the owner plus the portion of the cash value taxable to (or paid for by) the nonowner. *See id.* subdiv. (i). The amount of the insurance policy cash value is determined disregarding surrender charges or other similar charges or reductions and including insurance policy cash value attributable to paid-up additions. *See id.* subpara. (4)(i).

We have found *supra* that the relevant nonowners of the life insurance policies, namely, Mr. Blake, Mr. Abramo, Mr. Brown, and Mr. Tomassetti, were the only ones who had a right to the cash value of the policies that related to them. In addition, we have concluded *supra* that those individuals must recognize income for each subject year from their participation in the Sterling Plan. We hold that the amount of the income that they must recognize equals the value of their economic benefits as ascertained through the rules we have just discussed. The parties shall apply those rules in their calculation(s) of the decisions to be entered under Rule 155.

B. *Mr. Mejia*

Respondent argues that Mr. Mejia, Netversity's sole employee, realized income of $50,000 on account of Netversity's $50,000 payment to the Sterling Plan. We agree.

We have found that Netversity's $50,000 payment to the Sterling Plan is not an ordinary and necessary business expense deductible under section 162(a). Given that the payment is not a deductible business expense under section 162(a) and that it conferred an economic benefit on Mr. Mejia for his primary (if not sole) benefit, we conclude that the payment was a constructive distribution from Netversity to Mr. Mejia. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 91–92; *see also White v. Commissioner*, 103 T.C.M. (CCH) at 1572. In that the parties do not dispute that Netversity had sufficient earnings and profits to characterize the distribution as a dividend under section 301(c)(1) (and it appears from the record that it did), we hold that the distribution is a taxable dividend to Mr. Mejia.

V. *Accuracy-Related Penalties*

A. *Overview*

Respondent determined that each petitioner is liable for one or more accuracy-related penalties under sections 6662(a) and 6662A. As to section 6662(a), respondent determined that it applied to the Abramos for each subject year; to the Blakes, the Browns, the Tomassettis, and Our Country for 2005 and 2006; and to the Mejias and Netversity for 2006. As to section 6662A, respondent determined that it applied to the Blakes, the Abramos, the Browns, the Tomassettis, and Our Country for 2007. Respondent has since conceded that section 6662A does not apply to the Blakes.

Except in the cases of Our Country and Netversity, respondent bears the burden of production as to the applicability of these accuracy-related penalties. *See* sec. 7491(c). Section 7491(c) does not apply either to Our Country or to Netversity because they are C corporations. *See NT, Inc. v. Commissioner*, 126 T.C. 191, 195 (2006) (holding that section 7491(c) does not apply to a C corporation's liability for a penalty, an addition to tax, or an additional amount).

B. *Section 6662(a)*

1. *Background*

Respondent determined that the 20% accuracy-related penalty under section 6662(a) applies on account of substantial understatements of income tax, or alternatively, of negligence or of disregard of rules and regulations. Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty on the part of an underpayment of tax required to be shown on a return that is due to, among other reasons, negligence, disregard of rules or regulations, or a substantial understatement of income tax. These accuracy-related penalties do not apply to any portion of an underpayment for which a taxpayer had reasonable cause and acted in good faith. *See* sec. 6664(c)(1).

Petitioners argue that section 6662(a) is inapplicable because, they state, there was no substantial understatement of income tax, no negligence, and no disregard of rules or regulations. In addition, petitioners assert, they had substan-

tial authority for their positions, the items in question were adequately disclosed, and they had a reasonable basis for their tax treatment of the items in question. Finally, petitioners assert, they reasonably relied in good faith on the advice of their professional advisers.

## 2. *Substantial Understatement*

An individual's understatement of Federal income tax is "substantial" if the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). A corporation's understatement of Federal income tax is "substantial" if the understatement exceeds the lesser of 10% of the tax required to be shown on the return (or, if greater, $10,000) or $10 million. Sec. 6662(d)(1)(B).

An understatement generally exists to the extent that the correct tax exceeds the tax reported on the corresponding income tax return. *See* sec. 6662(d)(2)(A). In calculating this excess, items to which section 6662A applies are disregarded.[23] *See* sec. 6662(d)(2). The portion of the understated tax that is attributable to an item for which the taxpayer has substantial authority, or which the taxpayer adequately disclosed with a reasonable basis for the tax treatment thereof, also is not included in the understatement. *See* sec. 6662(d)(2)(B); *see also* sec. 1.6662–4(d)(3)(i), Income Tax Regs. (stating that a taxpayer has substantial authority where the weight of authority supporting the tax treatment of the item is substantial in relation to the contrary authority). Where understatements are attributable to tax shelters, the exceptions supported by substantial authority and adequate disclosure are not available. *See* sec. 6662(d)(2)(C). A tax shelter is any plan or arrangement where a significant purpose of the plan or arrangement is the avoidance or evasion of Federal income tax. *See* sec. 6662(d)(2)(C)(ii).

## 3. *Negligence*

Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Code or to exer-

---

[23] The amount of a reportable transaction understatement, however, is added when determining whether the understatement is substantial. *See* sec. 6662A(e)(1)(A).

cise ordinary and reasonable care in the preparation of a tax return. *See* sec. 6662(c); sec. 1.6662–3(b)(1), Income Tax Regs. The term "negligence" also has been defined as a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." *Neely v. Commissioner*, 85 T.C. 934, 947 (1985) (quoting *Marcello v. Commissioner*, 380 F.2d 499, 506 (5th Cir. 1967), *aff'g in part, remanding in part* 43 T.C. 168 (1964), *and* T.C. Memo. 1964–299). "[N]egligence is strongly indicated where * * * [a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances". Sec. 1.6662–3(b)(1)(ii), Income Tax Regs.

A taxpayer is not negligent as to an item for which the return position has a reasonable basis. *See id.* subpara. (1). An application of this reasonable basis exception is a relatively high standard of tax reporting that requires more than simply showing that the position taken on the return is not frivolous or patently improper. *See id.* subpara. (3). This high standard is not met by a return position that is arguably correct or merely a colorable claim. *See id.*

### 4. *Disregard*

Disregard includes any careless, reckless, or intentional disregard. *See* sec. 6662(c).

### C. *Section 6662A*

### 1. *Background*

Respondent determined that the 30% accuracy-related penalty under section 6662A applies because the Sterling Plan is substantially similar to the transactions identified as listed transactions in Notice 2007–83, 2007–2 C.B. 960. Petitioners argue that this accuracy-related penalty does not apply because the Sterling Plan is not a listed or reportable transaction. In addition, petitioners argue, this accuracy-related penalty does not apply because the transaction was adequately disclosed.

2. *Overview*

Congress enacted section 6662A as part of the American Jobs Creation Act of 2004 (AJCA), Pub. L. No. 108–357, sec. 812(a), 118 Stat. at 1577. Section 6662A imposes a 20% accuracy-related penalty on reportable transaction understatements and is effective for taxable years ending after October 22, 2004. *See* sec. 6662A(a); *see also* AJCA sec. 812(f), 118 Stat. at 1580. The penalty increases to 30% if the taxpayer does not adequately disclose the transaction. *See* sec. 6662A(c); *see also* sec. 6664(d)(3)(A). A "reportable transaction understatement" is the sum of—

> (A) the product of—
>    (i) the amount of the increase (if any) in taxable income which results from a difference between the proper tax treatment of an item to which this section applies and the taxpayer's treatment of such item (as shown on the taxpayer's return of tax), and
>    (ii) the highest rate of tax imposed by section 1 (section 11 in the case of a taxpayer which is a corporation), and
> (B) the amount of the decrease (if any) in the aggregate amount of credits determined under subtitle A which results from a difference between the taxpayer's treatment of an item to which this section applies (as shown on the taxpayer's return of tax) and the proper tax treatment of such item. [Sec. 6662A(b)(1).]

A transaction is a reportable transaction for purposes of section 6662A if it is either a "reportable transaction" or a "listed transaction" as those terms are defined in section 6707A(c). *See* sec. 6662A(b)(2), (d). As to the latter term, section 6707A(c)(2) generally defines a "listed transaction" as a transaction that is the same as, or substantially similar to, a transaction that the Commissioner has identified as a tax-avoidance transaction for purposes of section 6011. *See* sec. 6707A(c)(2). Regulations under section 6011 provide that a listed transaction is a transaction that is the same as or substantially similar to any transaction that the IRS identifies as such in a "notice, regulation, or other form of published guidance". Sec. 1.6011–4(b)(2), Income Tax Regs. The regulations provide that a substantially similar transaction is a transaction "that is expected to obtain the same or similar types of tax consequences and that is either factually similar or based on the same or similar tax strategy." *Id.* para. (c)(4).

The Commissioner published Notice 2007–83, 2007–2 C.B. at 960, to alert taxpayers and their representatives that

[t]he Internal Revenue Service (IRS) and Treasury Department are aware of certain trust arrangements claiming to be welfare benefit funds and involving cash value life insurance policies that are being promoted to and used by taxpayers to improperly claim federal income and employment tax benefits. This notice informs taxpayers and their representatives that the tax benefits claimed for these arrangements are not allowable for federal tax purposes. This notice also alerts taxpayers and their representatives that these transactions are tax avoidance transactions and identifies certain transactions using trust arrangements involving cash value life insurance policies, and substantially similar transactions, as listed transactions for purposes of § 1.6011–4(b)(2) of the Income Tax Regulations and §§ 6111 and 6112 of the Internal Revenue Code. This notice further alerts persons involved with these transactions of certain responsibilities that may arise from their involvement with these transactions.

\*    \*    \*    \*    \*    \*    \*

1. Promoted Arrangements

Trust arrangements utilizing cash value life insurance policies and purporting to provide welfare benefits to active employees are being promoted to small businesses and other closely held businesses as a way to provide cash and other property to the owners of the business on a tax-favored basis. The arrangements are sometimes referred to by persons advocating their use as "single employer plans" and sometimes as "419(e) plans." Those advocates claim that the employers' contributions to the trust are deductible under §§ 419 and 419A as qualified cost, but that there is not a corresponding inclusion in the owner's income.

A promoted trust arrangement may be structured either as a taxable trust or a tax-exempt trust, i.e., a voluntary employees' beneficiary association (VEBA) that has received a determination letter from the IRS that it is described in § 501(c)(9). The plan and the trust documents indicate that the plan provides benefits such as current death benefit protection, self-insured disability benefits, and/or self-insured severance benefits to covered employees (including those employees who are also owners of the business), and that the benefits are payable while the employee is actively employed by the employer. The employer's contributions are often based on premiums charged for cash value life insurance policies. For example, contributions may be based on premiums that would be charged for whole life policies. As a result, the arrangements often require large employer contributions relative to the actual cost of the benefits currently provided under the plan.

Under these arrangements, the trustee uses the employer's contributions to the trust to purchase life insurance policies. The trustee typically purchases cash value life insurance policies on the lives of the employees who are owners of the business (and sometimes other key employees), while purchasing term life insurance policies on the lives of the other employees covered under the plan.

It is anticipated that after a number of years the plan will be terminated and the cash value life insurance policies, cash, or other property

held by the trust will be distributed to the employees who are plan participants at the time of the termination. While a small amount may be distributed to employees who are not owners of the business, the timing of the plan termination and the methods used to allocate the remaining assets are structured so that the business owners and other key employees will receive, directly or indirectly, all or a substantial portion of the assets held by the trust.

Those advocating the use of these plans often claim that the employer is allowed a deduction under § 419(c)(3) for its contributions when the trustee uses those contributions to pay premiums on the cash value life insurance policies, while at the same time claiming that nothing is includible in the owner's gross income as a result of the contributions (or, if amounts are includible, they are significantly less than the premiums paid on the cash value life insurance policies). They may also claim that nothing is includible in the income of the business owner or other key employee as a result of the transfer of a cash value life insurance policy from the trust to the employee, asserting that the employee has purchased the policy when, in fact, any amounts the owner or other key employee paid for the policy may be significantly less than the fair market value of the policy. Some of the plans are structured so that the owner or other key employee is the named owner of the life insurance policy from the plan's inception, with the employee assigning all or a portion of the death proceeds to the trust. Advocates of these arrangements may claim that no income inclusion is required because there is no transfer of the policy itself from the trust to the employees.

Notice 2007–83, 2007–2 C.B. at 961, further states that any transaction that has all of the following elements, and any transaction that is substantially similar to such a transaction, are listed transactions for purposes of sections 6111 and 6112 and section 1.6011–4(b)(2), Income Tax Regs., effective October 17, 2007:

(1) The transaction involves a trust or other fund described in § 419(e)(3) that is purportedly a welfare benefit fund.

(2) For determining the portion of its contributions to the trust or other fund that are currently deductible the employer does not rely on the exception in § 419A(f)(5)(A) (regarding collectively bargained plans).

(3) The trust or other fund pays premiums (or amounts that are purported to be premiums) on one or more life insurance policies and, with respect to at least one of the policies, value is accumulated either:

(a) within the policy (for example, a cash value life insurance policy); or

(b) outside the policy (for example, in a side fund or through an agreement outside the policy allowing the policy to be converted to or exchanged for a policy which will, at some point in time, have accumulated value based on the purported premiums paid on the original policy).

(4) The employer has taken a deduction for any taxable year for its contributions to the fund with respect to benefits provided under the plan (other than post-retirement medical benefits, post-retirement life insurance benefits, and child care facilities) that is greater than the sum of the following amounts:

(a) With respect to any uninsured benefits provided under the plan,

(i) an amount equal to claims that were both incurred and paid during the taxable year; plus

(ii) the limited reserves allowable under § 419A(c)(1) or (c)(3), as applicable; plus

(iii) amounts paid during the taxable year to satisfy claims incurred in a prior taxable year (but only to the extent that no deduction was taken for such amounts in a prior year); plus

(iv) amounts paid during the taxable year or a prior taxable year for administrative expenses with respect to uninsured benefits and that are properly allocable to the taxable year (but only to the extent that no deduction was taken for such amounts in a prior year).

Notice 2007–83, 2007–2 C.B. at 962, states:

Whether a taxpayer has participated in the listed transaction described in this notice will be determined under § 1.6011–4(c)(3)(i)(A). However, an individual who is not the employer will be treated as a participant for a taxable year if, and only if the individual owns, directly or indirectly, 20 percent or more of an entity, other than a C corporation, that is a participant in the listed transaction for the taxable year. For this purpose, indirect ownership is determined under rules similar to the rules of § 318 but without regard to the family attribution rules of § 318(a)(1).

D. *Section 7491(c)*

1. *Overview*

As previously stated, the Commissioner bears the burden of production with respect to an individual taxpayer's liability for a section 6662(a) or 6662A accuracy-related penalty. This burden requires that respondent produce sufficient evidence indicating that it is appropriate to impose either or both penalties in these cases. *See* sec. 7491(c); *Higbee v. Commissioner*, 116 T.C. at 438, 446–447 (2001). Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer had reasonable cause or substantial authority for the position. *See Higbee v. Commissioner*, 116 T.C. at 446–447.

2. *Application*

a. *Determinations Under Section 6662(a)*

i. *Our Country and the Blakes*

A substantial majority of Our Country's payments to the Sterling Plan went toward the payment of premiums on the Blake policy, a cash value life insurance policy. Our Country deducted the full amount of its payments to the Sterling Plan even though the amounts of the payments were significantly greater than the current benefits provided by the plan and bore no relationship to the benefits that the plan provided.

Mr. Blake, in his individual capacity and as Our Country's sole shareholder, participated in the Sterling Plan as an investor in a good investment, rather than as a participant in a bona fide welfare benefit plan. The Blakes failed to report any income resulting from Mr. Blake's participation in the plan although Mr. Blake maintained control over the funds that Our Country paid to the Sterling Plan, e.g., he could receive his policy by causing Our Country, his wholly owned employer, to terminate its participation in the plan, and he could change the criteria for vesting at his desire. Mr. Blake also knew that he could access the Blake policy and the cash value that inhered therein, as evidenced by the fact that he caused Our Country to lower the retirement age applicable to its plan and fully vest him in the insurance policy taken out on his life.

ii. *Environmental and Its Owners*

Environmental deducted the full amount of its payments to the Sterling Plan even though the amounts of the payments were significantly greater than the current benefits provided by the plan and bore no relationship to the benefits that the plan provided. Environmental paid amounts to the Sterling Plan and deducted those payments without relying on the valuation reports from Mr. Snyder that purportedly showed the allowable and deductible contribution amounts. Environmental failed to take the steps that a prudent taxpayer would take in determining the tax effects of participation in the Sterling Plan.

None of Environmental's owners reported any income as to his participation in the Sterling Plan, and the record shows

that they each failed to take the steps that a prudent taxpayer would have taken in determining the tax effects of participation in the Sterling Plan. They (through Mr. Tomassetti) relied on information provided by Mr. Snyder, an insider to the Sterling Plan, to the effect that the plan was legitimate.

### iii. *Netversity and the Mejias*

Netversity deducted the full amount of its payments to the Sterling Plan even though the amounts of the payments were significantly greater than the current benefits the plan provided and bore no relationship to the benefits that the plan provided. The Mejias did not report any income as to Mr. Mejia's participation in the Sterling Plan, and the record shows that they failed to take the steps that a prudent taxpayer would have taken in determining the tax effects of participation in the Sterling Plan.

### iv. *Conclusion*

We conclude and hold that petitioners significantly underreported income on their Federal income tax returns for each subject year. In addition, the evidence shows (and we find) that petitioners consciously participated in a plan that, as advertised to them, they should have known (and probably knew) was too good to be true. A reasonable person in the position of petitioners also would not have been oblivious to the fact that the judiciary had rejected the use of cash value life insurance to fund welfare benefits in similar settings, *see Neonatology Assocs., P.A. v. Commissioner*, 299 F.3d 221; *id.*, 115 T.C. 43, and would have looked for more concrete guidance on the Sterling Plan before investing significant funds in it, as petitioners did.

We hold as to the noncorporate petitioners that respondent has met his burden of producing evidence showing that section 6662(a) penalties for underpayments of tax attributable to negligence or disregard of rules or regulations are appropriate with respect to the portions of the underpayments resulting from the unreported income. The actions of Mr. Blake during the first two subject years constituted "negligence" for purposes of section 6662(a), and those actions also were in disregard of the rules pertaining to welfare benefit plans. Likewise, the actions of Environmental's owners

during the first two subject years, and also of Mr. Abramo during the last subject year as well, constituted "negligence" for purposes of section 6662(a), and those actions also were in disregard of the rules pertaining to welfare benefit plans. Likewise, the actions of Mr. Mejia during 2006 constituted "negligence" for purposes of section 6662(a), and those actions also were in disregard of the rules pertaining to welfare benefit plans.

We further hold as to the noncorporate petitioners that respondent has met his burden of producing evidence showing that a section 6662(a) penalty for a substantial understatement of income tax applies to the extent that the tax, as determined on the basis of this Opinion, results in a "substantial understatement" as previously defined. [24]

### b. *Determinations Under Section 6662A*

We have found that the Sterling Plan ostensibly operated as a welfare benefit plan, that Our Country and Environmental made payments to the Sterling Plan that were used to pay the premiums on cash value life insurance policies, and that the Sterling Plan used those policies to fund the "welfare benefits" that it promised to pay under the Sterling Plan. We also have found that those corporate employers deducted the full amounts of the payments that they made to the Sterling Plan and that neither of those corporations nor any of Environmental's owners disclosed its or his participation in the Sterling Plan. We conclude that Our Country and Environmental participated in transactions that were substantially similar to the transaction described in Notice 2007–83, *supra*. We also conclude that each of Environmental's owners participated in the described transactions in that each owned at least 20% of Environmental, their employer, and participated in the transactions as

---

[24] We disagree with petitioners that their reporting of items stemming from the Sterling Plan meets the adequate disclosure or substantial authority test, and that this in turn leads to a reduction of their understatements for purposes of sec. 6662(d). We note, however, that to the extent that petitioners did meet one or both of those tests, they would still not prevail on this point. This is because the Sterling Plan falls within the definition of a "tax shelter" under sec. 6662(d)(2)(C)(ii). *See* sec. 6662(d)(2)(C) (stating that those grounds do not reduce an understatement of tax attributable to a tax shelter).

employees covered by the Sterling Plan. In the light of these conclusions, we hold as to Environmental's owners that respondent has met his burden of producing evidence showing the appropriateness of the section 6662A penalties that he determined applied to them.[25]

E. *Reasonable Cause*

1. *Section 6662(a)*

a. *Overview*

An accuracy-related penalty under section 6662(a) is not appropriate in a case where a taxpayer demonstrates that reasonable cause existed for an underpayment of tax and that the taxpayer acted in good faith with respect to the underpayment. *See* sec. 6664(c)(1). A taxpayer's reliance on professional advice may sometimes meet this standard. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 98–99; *see also* sec. 1.6664–4(b)(1), Income Tax Regs. Reliance on a tax professional will generally meet this standard where the facts and circumstances coupled with the applicable law establish that (1) the taxpayer selected a competent tax adviser, (2) supplied the adviser with all relevant information, and (3) relied in good faith on the adviser's professional judgment. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 98–99. Reliance tends to be unreasonable when it is based on insiders, promoters, or their offering materials or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about. *See id.*

b. *Our Country and the Blakes*

We do not find that the three-prong *Neonatology* test has been met either as to Our Country or as to Mr. Blake. Mr. Blake caused Our Country to invest in the Sterling Plan upon the recommendation of Mr. Reckard, who, while a

---

[25] A sec. 6662 accuracy-related penalty generally may not be imposed on the portion of an underpayment to which an accuracy-related penalty under sec. 6662A also is imposed. *See* sec. 6662(b) (flush language). Exceptions to this general rule are found in sec. 6662A(e)(1) and (2)(B). *See id.* The sec. 6662(a) accuracy-related penalty that respondent determined for the Abramos' 2007 taxable year therefore applies only to the extent that it fits within the flush language or one of the referenced exceptions.

C.P.A., was then acting in his capacity as an insurance agent/financial planner.[26] Mr. Blake considered the investment primarily to be a good financial investment and a way to defer taxes, and he effected the investment relying to a significant extent on his perception of the reputation of Guardian, the insurance company selling the life insurance that pertained to Our Country's employees. While Mr. Blake eventually sought out the advice of Mr. Penner, his longtime friend who was an estate planning attorney, as to the appropriateness of his already-made investment in the Sterling Plan, the record does not establish the extent of their discussion(s) or the professional advice that Mr. Penner gave Mr. Blake as to this matter.[27] Nor does the record establish whether Mr. Blake left their discussion(s) with the necessary foundation to rely in good faith upon any advice that Mr. Penner gave him. We do know, however, that the proffered benefits of the Sterling Plan were too good to be true and that Mr. Penner advised Mr. Blake that an investment in the Sterling Plan was risky. We also know that the Sterling Plan explicitly warned potential investors in the plan that they might want to consult with a professional as to the consequences of such an investment and that while the record establishes that petitioners (either directly or indirectly through their owners or representatives) discussed the Sterling Plan with accountants and/or attorneys, the record does not establish the specifics or breadth of those discussions.

We hold that Our Country and Mr. Blake have failed to demonstrate that reasonable cause existed for their underpayments of tax or that they acted in good faith with respect to the underpayments.

c. *Environmental's Owners*

We do not find that the three-prong *Neonatology* test has been met as to any of Environmental's owners. As to Mr. Abramo and Mr. Brown, the record contains no information regarding any steps that they personally took to determine

---

[26] Previously, Mr. Blake had disregarded the recommendation of another C.P.A., Mr. Ringger, to invest in the Sterling Plan, because Mr. Ringger was not a financial planner.

[27] We infer from the record, however, that Mr. Penner reached his conclusions as to the Sterling Plan relying mainly (if not solely) upon the statements and views of individuals connected with the Sterling Plan.

their proper tax liabilities. The actions of Mr. Tomassetti, the point person for the other two owners, were equally unclear. The record does not establish whether and to what extent Mr. Tomassetti sought the advice of Mr. Scutellaro, testifying that he did not "specifically recall" whether he asked Mr. Scutellaro to advise him on whether the contributions would be deductible to the corporation or would result in income to the shareholders.

The mere fact that Mr. Tomassetti relied upon Mr. Scutellaro, a C.P.A., to file his and Environmental's tax returns correctly does not necessarily mean that Mr. Tomassetti or any of Environmental's other owners had reasonable cause and acted in good faith with respect to those returns. Moreover, to whatever extent the Environmental owners relied on Mr. Scutellaro's advice, it is not sufficient to relieve them of liability for the accuracy-related penalties. Mr. Scutellaro was not an expert in welfare benefit plans, he did not purport to be such an expert, he did not prepare or seek a tax opinion regarding the validity of the Sterling Plan or of the deductibility of the contributions, and he relied entirely or almost entirely on information from the promoter, Mr. Snyder, in providing any advice he gave. In fact, as we find, Mr. Scutellaro for the most part simply relayed to Mr. Tomassetti the view of Mr. Snyder as to the tax consequences flowing from the Sterling Plan.

We hold that each of Environmental's owners has failed to demonstrate that reasonable cause existed for his underpayments of tax or that he acted in good faith with respect to the underpayments.

d. *Netversity and the Mejias*

We do not find that the three-prong *Neonatology* test has been met either as to Netversity or as to Mr. Mejia. While the record establishes that Mr. Morgan told Mr. Mejia that he should invest in the Sterling Plan, the record does not establish that Mr. Morgan gave Mr. Mejia any advice as to the tax consequences of any such investment. In fact, the record leads to a contrary conclusion. Mr. Mejia, by his own admission, acknowledged that he "blindly expected" that he was going to invest money in the Sterling Plan without any tax consequences.

Moreover, even if Mr. Morgan did give Mr. Mejia tax advice as to the Sterling Plan, the mere fact that Mr. Morgan was a C.P.A. does not necessarily mean that he was a competent tax adviser, especially on the subject of the tax consequences flowing from Mr. Mejia's participation in the Sterling Plan. Nor does the record establish that Mr. Mejia supplied Mr. Morgan with all relevant information or that Mr. Mejia relied in good faith on the adviser's professional judgment.

We hold that Netversity and Mr. Mejia have failed to demonstrate that reasonable cause existed for their underpayments of tax or that they acted in good faith with respect to the underpayments.

2. *Section 6662A*

a. *Overview*

A taxpayer may avoid a section 6662A penalty if there is reasonable cause for the taxpayer's treatment of the transaction and the taxpayer acted in good faith. *See* sec. 6664(d). In this context, a taxpayer has reasonable cause and acted in good faith if: (1) the taxpayer followed the disclosure provisions of the section 6011 regulations, (2) the taxpayer has substantial authority for his or her position, and (3) the taxpayer reasonably believed that the position was more likely than not the proper treatment. *See* sec. 6664(d)(2). If the transaction was not adequately disclosed, the reasonable cause and good faith defense is not available and the taxpayer is liable for a higher 30% penalty.

b. *Application*

None of the relevant petitioners adequately disclosed his or its participation in the Sterling Plan.[28] The reasonable cause

---

[28] We are not unmindful that Our Country amended its tax return for 2007 to include a statement disclosing its participation in the Sterling Plan. We do not consider that action to be adequate disclosure for purposes of this defense. *See* sec. 1.6011–4(e)(1), Income Tax Regs. (requiring that a taxpayer such as Our Country attach a disclosure statement to its tax return for each taxable year for which it participates in a reportable transaction *and* to each amended return that reflects that participation and send a copy of the disclosure statement to the IRS Office of Tax Shelter Analysis). Petitioners do not argue in their brief that the amended return was a "qualified amended return" within the meaning of sec. 1.6664–

and good faith defense is therefore not available to any them. Each of these petitioners is liable for the 30% penalty.

## VI. *Conclusion*

We have considered all of the arguments that petitioners made, and to the extent not discussed above, conclude that those arguments not discussed herein are irrelevant, moot, or without merit. We have considered respondent's arguments only to the extent stated herein.

To reflect the foregoing,

*Decisions will be entered under Rule 155*.

———

2(c)(3), Income Tax Regs., and we therefore do not consider the applicability of that section to this issue. *See Swords Trust v. Commissioner*, 142 T.C. 317, 339 n.30 (2014) (holding that the Commissioner decided to forgo, or otherwise waived, an argument that he did not make in his opening brief); *cf. Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012) (stating that "arguments raised for the first time in a reply brief are deemed waived").